**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED FOOD AND COMMERCIAL WORKERS UNIONS AND EMPLOYERS MIDWEST HEALTH BENEFITS FUND, individually and on behalf of all others similarly situated, | ) ) ) ) ) ) | |
| Plaintiff, | ) ) | No. |
| v. | ) ) | |
| WALGREEN COMPANY, PAR PHARMACEUTICAL COMPANIES, INC., and PAR PHARMACEUTICAL, INC., | ) ) ) ) | |
| Defendants. | ) ) ) | **JURY TRIAL DEMANDED** |

<u>**CLASS ACTION COMPLAINT**</u>

## TABLE OF CONTENT

NATURE OF THE ACTION ...........................................................................................1

JURISDICTION AND VENUE ....................................................................................3

THE PARTIES ...........................................................................................................3

FACTUAL ALLEGATIONS ........................................................................................5

    A.  Prescription Drugs ........................................................................................5

    B.  Pharmacy Reimbursement for Prescription Drugs .......................................7

    C.  Ranitidine ....................................................................................................10

    D.  Fluoxetine ...................................................................................................11

    E.  Defendants' Schemes to Unlawfully Overcharge Third-Party Payors .......12

        Defendants Switched Ranitidine Tablets to Capsules ..........................12

        Defendants Switched Fluoxetine Capsules to Tablets .........................20

    F.  UFCW has been Injured in its Business and Property ...............................28

        UFCW's Ranitidine Transactions ...............................................................29

            (1)  Ranitidine Capsules Were More Expensive Than Ranitidine Tablets ......29

            (2)  Walgreens Dispensed the More Expensive Ranitidine Capsules to UFCW Members 91.8% of the time, while Other Leading Pharmacy Chains Dispensed the More Expensive Capsules Less than 1% of the time. .......31

        UFCW's Fluoxetine Transactions ...............................................................35

            (1)  Fluoxetine Tablets Were More Expensive Than Fluoxetine Capsules......35

            (2)  Walgreens Dispensed the More Expensive Fluoxetine Tablets to UFCW Members 92.8% of the time, while Other Leading Pharmacy Chains Dispensed the More Expensive Capsules Less than 10% of the time. .....38

THE DISCOVERY RULE AND TOLLING OF THE STATUTES OF LIMITATIONS............41

CLASS ALLEGATIONS ...................................................................................42

COUNT I
VIOLATION OF 18 U.S.C. § 1962(c)
Racketeer Influenced and Corrupt Organizations Act
(Against Walgreens) .......................................................................................45

COUNT II
VIOLATION OF 18 U.S.C. § 1962(c)
Racketeer Influenced and Corrupt Organizations Act
(Against Par) .....................................................................................................56

COUNT III
VIOLATION OF 18 U.S.C. § 1962(d)
Racketeer Influenced and Corrupt Organizations Act
(Against Walgreens) .......................................................................................67

COUNT IV
VIOLATION OF 18 U.S.C. § 1962(d)
Racketeer Influenced and Corrupt Organizations Act
(Against Par) .....................................................................................................68

JURY TRIAL DEMANDED...............................................................................70

TABLE OF EXHIBITS ......................................................................................71

Plaintiff, United Food and Commercial Workers Unions and Employers Midwest Health Benefits Fund ("Plaintiff" or "UFCW"), individually and on behalf of all others similarly situated, brings this Complaint based upon knowledge as to itself and its own acts and, as to all other matters, upon information and belief based on the investigation of counsel, including the matters of public record in the actions styled *United States of America ex rel. Bernard Lisitza v. Walgreen Co.*, No. 03-C-00744 (N.D. Ill.) and *United States of America ex rel. Bernard Lisitza v. Par Pharmaceutical Companies, Inc., et al.,* No. 06-c-6131 (N.D. Ill.).

## NATURE OF THE ACTION

1.       Defendant Walgreen Company ("Walgreens") operates more than 7,000 pharmacies in forty-nine (49) states, the District of Columbia and Puerto Rico.  Defendants Par Pharmaceutical, Inc. and Par Pharmaceutical Companies, Inc. (collectively "Par"), market and sell generic drugs, including generic versions of the highly prescribed brand name drugs Zantac (known generically as ranitidine HCl or "ranitidine") and Prozac (known generically as fluoxetine hydrochloride or "fluoxetine").

2.       As alleged herein, Walgreens and Par engaged in at least two widespread schemes to overcharge insurance companies, self-insured employers and union health and welfare funds (collectively referred to as "third-party payors" or "TPPs"), for the  generic versions of Zantac, Prozac, and other drugs.  Walgreens and Par established the "Walgreens/Par/Hrp" (*i.e.*, health resource partnership) whereby Par manufactured and/or marketed generic versions of Zantac and Prozac in dosage forms that were not subject to strict private and governmental reimbursement limitations.  Walgreens purchased these dosage forms from Par -- at a cost substantially higher

1

than the widely prescribed dosage forms -- and systematically and unlawfully filled its customers' prescriptions with Par's more expensive products, rather than the inexpensive dosage forms that were prescribed by physicians.

3.      This enabled Walgreens to achieve a higher mark-up, thereby recovering its costs and increasing its profits on these pharmaceuticals.  For example, even though a pharmacy cannot legally change a prescription without a physician's express authorization, Walgreens filled prescriptions written for low-priced 150-mg ranitidine *tablets* with much more expensive 150-mg ranitidine *capsules* manufactured by Par.  This scheme enabled Walgreens and Par to garner unlawful profits by illegally changing prescriptions.  As a result of this unlawful conduct, Plaintiff and other third-party payors paid two to four times more than they would have had the prescriptions been filled as written.  Plaintiff asserts causes of action for violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and (d).

4.      On June 4, 2008, the United States Department of Justice announced Walgreens' agreement to pay $35 million to the United States, 42 states and Puerto Rico for overcharging state Medicaid programs by filling prescriptions with the more expensive dosage forms of ranitidine and fluoxetine.  The government claims were asserted in a "whistleblower" lawsuit styled *United States of America ex rel. Bernard Lisitza v. Walgreen Co.*, No. 03-C-00744 (N.D. Ill.).

5.      On July 19, 2011, a whistleblower lawsuit against Par and related parties was unsealed.  *United States of America ex rel. Bernard Lisitza v. Par Pharmaceutical Companies, Inc., et al.,* No. 06-c-6131 (N.D. Ill.).  The unsealed pleadings publicly revealed many details

2

and internal workings of Walgreens' and Par's schemes, including documents demonstrating the nature and extent of Walgreens' and Par's fraudulent activities.  Many of the documents are attached to this Complaint as Exhibits 1 through 25 and incorporated herein.

## JURISDICTION AND VENUE

6.      This court has federal question jurisdiction under 28 U.S.C. § 1331 and 18 U.S.C. § 1964(a) because Plaintiff's complaint asserts causes of action for violations of 18 U.S.C. § 1962.

7.      Venue is proper within this District under 28 U.S.C. § 1391(b) and 18 U.S.C. § 1965(a) because Defendants are found in or transact business within this District, and the interstate trade and commerce, hereinafter described, is carried out, in substantial part, in this District.

## THE PARTIES

### Plaintiff

8.      Plaintiff United Food and Commercial Workers Unions and Employers Midwest Health Benefits Fund is an "employee welfare benefit plan" and "employee benefit plan" maintained pursuant to § 302(c)(5) of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 186(c)(5), and as defined by § 1002(1) and (3) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001, *et seq*.  As such, UFCW is a legal entity that may bring suit in its own name pursuant to 29 U.S.C. § 1132(d).  UFCW's offices, from which it pays medical benefits, including benefits for prescription drugs, is located in Cook County, Illinois.

9.     Pursuant to the Trust Agreement under which it was created, UFCW provides comprehensive health care benefits to approximately 15,000 participants and family members.

10.     UFCW's health and medical benefits are provided under a written benefit plan. The plan contains certain subrogation provisions under which UFCW is subrogated to and assigned the rights and causes of actions of its participants and beneficiaries for whom it pays benefits.  During the Class Period described below, many of UFCW's participants and beneficiaries purchased Par's ranitidine capsules and fluoxetine tablets at Walgreens.  UFCW, as a TPP, paid Walgreens for the cost of Par's ranitidine capsules and fluoxetine tablets, less a participant's copayment amount.  UFCW has thereby been injured as a result of Defendants' unlawful conduct.

**Defendants**

11.     Walgreen Company d/b/a Walgreens is an Illinois corporation headquartered in Deerfield, Illinois.  Walgreens operates approximately 7,000 retail pharmacies stores in 49 states, the District of Columbia, and Puerto Rico.

12.     Par Pharmaceutical Companies, Inc. and its wholly owned subsidiary Par Pharmaceutical, Inc. (collectively "Par"), are Delaware corporations with their corporate headquarters in Woodcliff Lake, New Jersey.  Par has additional facilities for research, manufacturing and distribution in Suffern, New York and Spring Valley, New York.  Par develops, manufactures, markets and distributes pharmaceutical products, including generic pharmaceuticals.  Par is currently the fifth largest generic drug manufacturer in the United States with annual sales of approximately $430 million.

4

## FACTUAL ALLEGATIONS

**A.**    **Prescription Drugs**

13.    Under the federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301, *et seq*., (the "FDCA"), a manufacturer must obtain approval from the FDA before a new drug can be manufactured and sold. A manufacturer seeks approval for a new drug, often referred to as a "pioneer drug," by filing a New Drug Application ("NDA") with the FDA demonstrating that the drug is safe and effective for its intended use. New drugs that are approved for sale in the United States by the FDA are typically covered by patents and marketed under a brand name.

14.    The drugs at issue in this action were available as generics throughout the Class Period. Generic drugs are drugs which the FDA has found to have the same active chemical composition and to provide the same therapeutic effects as the pioneer, brand name drug. When a generic drug is bioequivalent to a pioneer or brand name drug, the FDA assigns the generic drug an "AB" rating. According to the FDA, a bioequivalent drug rated "AB" may be used and substituted interchangeably with the referenced branded drug.

15.    Once the safety and effectiveness of a new drug is approved by the FDA, it may be used in the United States only under the direction and care of a physician who writes a prescription, specifying the drug by name. The drug may then be purchased from a licensed pharmacist, at a pharmacy such as Walgreens. The pharmacist must, in turn, fill the prescription with the drug specified by the physician, unless an AB-rated generic version of that pioneer drug which has been approved by the FDA is available. For instance, once a physician writes a prescription for a brand-name drug such as Zantac, that prescription can be filled only with the

5

brand-name drug named or its AB-rated generic equivalent. Only generic drugs that carry the FDA's "AB" rating may be substituted by a pharmacist for a doctor's prescription for a brand name drug.

16.     If an AB-rated generic formulation of a brand name drug exists and the physician has not specifically indicated on the prescription "DAW" or "dispense as written" (or similar indications, the wording of which varies slightly from state to state), then: (a) for consumers covered by insurance that includes a prescription benefit plan, the pharmacist will substitute the generic drug; and (b) for consumers whose purchases are not covered by prescription drug benefit plans, the pharmacist will offer the consumer the choice of purchasing the AB-rated generic drug at a lower price.

17.     Shortly before Defendants' drug switching schemes were implemented, the FDA confirmed the distinction between tablets and capsules and rejected the proposition that tablets and capsules are interchangeable. On December 1, 2000, after public notice and comment, the FDA denied a proposal from pharmaceutical manufacturers requesting that the FDA consider tablets and capsules as equivalents.

> In sum, the FDA has concluded that patients and healthcare practitioners have a significant interest in, and legitimate concerns regarding, the *form* of oral drug products, and that tablets and capsules, while similar in many respects, have special properties that may make one or the other more advantageous in the treatment of certain patients. Tablets and capsules, therefore, should not be regarded as the same form.

**Exhibit 1** (Letter from Janet Woodcock, M.D., FDA Center for Drug Evaluation and Research, December 1, 2000) (emphasis in original).

6

18.     Even when drugs are AB-rated by the FDA, state law generally allows substitution only when it will result in a lower price to the consumer or third-party payors. Illinois law, for example, provides that:

> if the physician or other authorized prescriber, when transmitting an oral or written prescription, does not prohibit drug product selection, a different brand name or nonbrand name drug product of the same generic name may be dispensed by the pharmacist, <u>provided that the selected drug has a unit price less than the drug product specified in the prescription</u>.

225 ILCS 85/25 (emphasis added).  Other states have similar laws.

## B.     Pharmacy Reimbursement for Prescription Drugs

19.     Retail pharmacies, such as Walgreens, fill prescriptions for customers with and without prescription benefits coverage.  Those customers who have private insurance (as opposed to government programs such as Medicaid) get prescription drug coverage from insurance companies, self-insured employers or union health and welfare funds.  While those customers usually pay a copayment (or "co-pay") for prescription drugs, the remainder of the price of the drug is paid by the TPP.  During the Class Period, the vast majority of consumers had some type of prescription drug coverage.  Indeed, nearly 80% of a pharmacy's revenue comes from prescriptions that are paid for in part by private insurance and approximately 64% of all money paid for prescription drugs is paid by TPPs.  Pharmacies are very aware of how they are paid for prescriptions covered by insurance.

20.     The focus on insured customers has had a significant impact on pharmacy management.  While pharmacies determine what price they will charge insured customers, TPPs and pharmacy benefit managers (or "PBMs") acting on behalf of TPPs establish the rate at which

TPPs will reimburse pharmacies for prescriptions. Pharmacies usually are not allowed to charge more than an established reimbursement rate.

21. PBMs contract with third-party payors or health-plan administrators, such as insurers, HMOs, and employers, to facilitate delivery of prescription drugs to the health-plan members or other individuals to whom the third-party payors provide prescription drug benefits. PBMs create pharmacy networks by negotiating with retail pharmacies that agree to accept defined reimbursement rates when they fill prescriptions for health-plan members. PBMs assist third-party payors and health-plan administrators by "adjudicating" claims for prescription drug benefits submitted by pharmacies, thereby acting as intermediaries between the third-party payors and pharmacies in providing pharmacy benefits. "Adjudicate" is a term of art in the PBM industry for processing claims over the PBMs' various computer systems. Third-party payors, such as UFCW, pay pharmacies directly to reimburse for their members' purchases of prescription drugs, using PBMs and their adjudication processes as conduits and payment agents for such payments.

22. The reimbursement rate, or price, for a third-party prescription is based on a reimbursement-rate formula that is specified in the contract between the pharmacy and TPP, or between the pharmacy and the PBM on behalf of the TPP. The reimbursement-rate formula almost universally consists of two parts: the ingredient cost and the dispensing fee. The ingredient cost is intended to pay the pharmacy for the cost of the drug product, and the dispensing fee is intended to cover the cost of dispensing the prescription.

8

23.     In the case of generic drugs that are available from more than one source, ingredient cost is, in most cases, based on a Maximum Allowable Cost, or "MAC." The MAC for a particular drug is set by a TPP or PBM and represents the most the payor will reimburse the pharmacy for that drug regardless of which manufacturer's version of the drug is dispensed. The federal government also calculates and publishes a list of MACs for selected generic drug products, and some third-party payors, rather than developing their own, proprietary MACs, use the federal MAC lists. Since PBMs usually pay pharmacies at MAC, TPPs in turn reimburse at MAC plus a certain percentage.

24.     MAC prices are based on information that third-party payors and PBMs gather in the marketplace about prices. MAC pricing is usually updated regularly in order to accommodate, among other things, the entrance and exit of various generic competitors from a given market.

25.     In general, TPPs and PBMs set MACs by gathering the prices of each manufacturer's version of a generic drug. They then decide, using a formula based on Average Wholesale Price ("AWP"), the maximum amount they are willing to pay a pharmacy for any manufacturer's version of the generic drug. That amount becomes the MAC for all versions of a generic drug. AWP is a benchmark price published by drug manufacturers but used as the basis for third-party payors' pharmacy reimbursements. While AWP remains the standard benchmark for reimbursement of brand drugs, AWP is used as the benchmark for reimbursement of generic drugs in the private marketplace only when there is no MAC price available. While MACs are set based on actual prices in the marketplace, AWPs are benchmark prices that often bear no

9

resemblance to prices in the marketplace. *See In re Average Wholesale Price Litig.*, 491 F. Supp. 2d 20, 33 (D. Mass. 2007). Thus, pharmacies like Walgreens make more profit on generics that are priced based on AWP, as compared to generics that are subject to MAC pricing limits. Likewise, TPPs pay far less for generics that are subject to MAC-based pricing.

26. MAC-based reimbursement is designed to reduce the uncertainty that can be associated with generic pricing. For example, absent MAC pricing, a third-party payor could pay $10.00 for one generic version of a drug, while paying $15.00 for another version.

27. While TPPs and PBMs provide their MAC lists to pharmacies like Walgreens so that pharmacies can price based on those MACs, TPPs and PBMs consider their proprietary MAC lists to be highly confidential. Those TPPs who do not develop their own MAC lists generally do not have access to the MAC lists developed by their PBMs. Indeed, they may not even know the methodology used by PBMs to develop those proprietary MAC prices.

**C.** **Ranitidine**

28. Ranitidine was developed by Glaxo (now GlaxoSmithKline) and introduced under the brand-name Zantac in 1981. Zantac went off-patent in July 1997 and numerous manufacturers launched generic versions of the drug. The most popular dosage forms of ranitidine are 150-mg and 300-mg tablets, which are manufactured and marketed by several firms. Par was one of only a few manufacturers to market 150-mg and 300-mg ranitidine *capsules*. Ranitidine tablets and ranitidine capsules contain the same active ingredient, but because they are different *forms,* they are not AB-rated bioequivalents. Accordingly, a

10

pharmacist cannot fill a prescription for Zantac or ranitidine 150-mg or 300-mg tablets with capsules, or vice versa, without express written authorization from the prescribing physician.

29.     With several manufacturers producing ranitidine tablets, and tablets being the most popular dosage form, third-party payors and PBMs adopted MACs specifying the amounts that they were willing to pay or reimburse for ranitidine tablets.  MACs were not adopted for ranitidine capsules, however, because they were produced by only a few manufacturers and were rarely prescribed.  Accordingly, payment and reimbursement for ranitidine capsules generally involves application of an AWP-based formula, making ranitidine capsules much more expensive than ranitidine tablets.

**D.     Fluoxetine**

30.     Fluoxetine hydrochloride (which has been sold under brand-names including Prozac and Sarafem) is a widely-prescribed antidepressant developed by Eli Lilly and Company. Eli Lilly's patent on fluoxetine expired in August 2001, prompting an influx of generic versions of the drug onto the market.  The most popular dosage forms of fluoxetine are 10-mg and 20-mg capsules, which are manufactured and marketed by several firms.  Alphapharm Pty Ltd. ("Alphapharm") and Genpharm ULC ("Genpharm") were among only a few manufacturers to produce 10-mg and 20-mg fluoxetine tablets.  Alphapharm and Genpharm provided Par exclusive sales and distribution rights in the United States.  Fluoxetine capsules and fluoxetine tablets contain the same active ingredient, but because they are different *forms,* they are not AB-rated bioequivalents.  Accordingly, a pharmacist cannot fill a prescription for Prozac or

11

fluoxetine 10-mg or 20-mg capsules with tablets, or vice versa, without express written authorization from the prescribing physician.

31.     With several manufacturers producing fluoxetine capsules, and capsules being the most popular dosage form, third-party payors and PBMs adopted MACs specifying the amounts that they were willing to pay or reimburse for fluoxetine capsules.  MACs were not adopted for fluoxetine tablets, however, because they were produced by only a few manufacturers and were rarely prescribed.  Accordingly, payment and reimbursement for fluoxetine tablets generally involves application of an AWP-based formula, making fluoxetine tablets much more expensive than fluoxetine capsules.

### E.     Defendants' Schemes to Unlawfully Overcharge Third-Party Payors

32.     Starting in April 1999 through December 31, 2006, Par and Walgreens conspired to increase their profits through at least two schemes to illegally fill prescriptions with Par's higher-priced products rather than the specific drugs prescribed by physicians.  These schemes were purposefully designed to evade price limits on generic drugs.

### Defendants Switched Ranitidine Tablets to Capsules

33.     Par implemented a fraudulent scheme to evade reimbursement limits for tablets of ranitidine, the generic form of the brand-name antacid Zantac.  Doses of 150-mg and 300-mg of ranitidine require a prescription.  Par caused Walgreens and other pharmacies to fill prescriptions for Zantac and ranitidine tablets with Par's capsules because of the huge profits to be made by making the switch.

34.     Brand-name Zantac and generic ranitidine are prescribed almost exclusively in

tablet form. Indeed, from January 1, 2000 through May 31, 2001, 100% of the 17,945 units of ranitidine prescriptions filled by UFCW members at Walgreens were filled with ranitidine tablets. *See* ¶ 97, *infra*. On April 6, 2000, the Centers for Medicare & Medicaid Services ("CMS") announced that they were setting a Federal Upper Limit ("FUL") for ranitidine tablets. Par saw the opportunity to profit by evading this limit through a scheme to fill ranitidine tablet prescriptions with Par's ranitidine capsules.

35. After the CMS announcement, Par attempted to persuade Walgreens and other pharmacies to fill all Zantac and ranitidine prescriptions with Par's ranitidine capsules. Par made presentations, distributed flyers, and used other methods to convince pharmacies to participate in the switching scheme to evade the upcoming Medicaid price limits and similar MAC limitations that would be adopted by private health benefits plans and pharmacy benefits managers.

36. Par's marketing presentation to Walgreens, prepared in November 2000 by Par's executive vice-president of sales and marketing, Nick DiMaio, explained how Walgreens could make over $75 million in additional profits by filling prescriptions for Zantac and ranitidine tablets with Par's ranitidine capsules, even though Par's capsules would cost Walgreens considerably more than the competing tablets. Par's president at the time, Scott Tarriff, was also directly involved in marketing the scheme to Walgreens.

37. Par's "Walgreens Ranitidine Analysis," attached as **Exhibit 2** [PAR-TX 0000163], showed that Par planned to charge Walgreens *five times more* for its form of ranitidine. Walgreens' acquisition cost would be 9.5 cents for each Par capsule but only 1.9 cents for a competitor's tablet, for a per-prescription acquisition cost of $5.70 for Par's capsule

versus only $1.14 for a tablet. *Id.*

38.     As part of its Walgreens Ranitidine Analysis, Par highlighted the upcoming

Medicaid price limits for ranitidine tablets, known as the "Proposed HCFA MAC." HCFA was

the acronym for the federal Health Care Finance Administration of the Department of Health and

Human Services (now known as the Centers for Medicaid and Medicare Services or CMS). The

MAC is the Maximum Allowable Cost, a Medicaid price limit set for generic drugs reimbursed

by the state Medicaid programs.

39.     Par explained to Walgreens that, while Par's capsules would cost more, there

would be a MAC price limit for tablet reimbursements but there would be no such

reimbursement limit for Par's capsules. Medicaid would pay Walgreens $71.45 per prescription

for Par's capsules, but only $5.35 for a tablet prescription. Par's analysis showed that by

evading the MAC on ranitidine tablets, Walgreens could make a profit of $65.75 for each Par

capsule prescription, compared to a profit of only $4.21 for each tablet prescription. Although it

would pay five times more for Par's capsules, Walgreens would make 15 times more profit. *Id.*

40.     Par's Walgreens Ranitidine Analysis was so detailed that it calculated Walgreens

annual ranitidine prescriptions to be 1,222,917. Par projected that Walgreens would make

$80,400,656 in profits by instituting the capsule switching scheme, but only $5,143,588 by

dispensing the prescribed tablets. *Id.*

41.     Nick DiMaio, Par's top marketing executive, was often assisted at these

presentations by Julie Trendowicz, Par's vice president of sales and marketing. In an interview

with the FBI, Trendowicz confirmed Par's marketing plan for evading MAC price limits:

14

> Q. Well, when you go in and offer the product, you market it on the basis of there being a MAC on the competition, as opposed to the product that Par wishes to sell, don't you?
>
> [Objection omitted.]
>
> THE WITNESS: If we offer that program to [Walgreens], yes, that's what we would have.

**Exhibit 3** [Day 2, p. 456-57, lines 20-26].

42. In a May 15, 2001 email, Bill Groth, Walgreens' divisional manager for pharmacy purchasing, wrote that:

> Since these items [*i.e.,* ranitidine 150mg and 300mg] are highly competitive 3rd party payors and the government have created MAC (maximum allowable cost) pricing which limits our reimbursement. . . . By switching to a capsule dosage form we have discovered that there are not currently constraints on MAC. . . .At a 50% conversion rate increased GP [gross profit] dollars could achieve approximately $1.66MM per month. . . .

**Exhibit 4** [W 11022].

43. Groth later testified about this email and specifically how he came to know about the lack of a MAC on Par's ranitidine capsules:

> Q. Further down in the email, you wrote: "Since these items are highly competitive, third-party payors and governments have created MAC's which limits our reimbursement." And then you stated that by switching to the capsule, you've discovered there are no constraints on the MAC. How did you discover that there were no constraints on the MAC?
>
> A. I believe that, again, was presented by Par Pharmaceutical.

**Exhibit 5** [p. 34, lines 5-15].

44. To facilitate the ranitidine switching scheme, Walgreens and Par established the "Walgreens/Par/Hrp" (*i.e.*, health resource partnership). As part of this partnership, Par

15

marketed ranitidine capsules as if they were bioequivalent to, and thus legally interchangeable with, ranitidine tablets, when in fact they were not. **Exhibit 7** [W 00066-70]. Walgreens agreed to buy Par's ranitidine capsules for the purpose of engaging in the switching scheme.

45.     In a company-wide email sent on July 12, 2001, Tom Lawlor, Walgreens' director of pharmacy marketing, announced the switching program:

> On Tuesday, July 16, 2001, we will <u>begin automatically switching</u> all prescriptions for ranitidine 150 mg and 300 mg tablets (Mylan) to ranitidine 150 mg and 300 mg capsules by Par Labs. Brand name prescriptions for Zantac tablets <u>will also be converted</u> to the new dosage form when the respective generic is dispensed.
>
> <u>Ranitidine capsules by Par are AB rated generic products</u>. All stores have been set distributions of Ranitidine capsules based on their movement of Ranitidine tablets.
>
> To ease the conversion to Ranitidine capsules, Ranitidine tablets will continue to be available from your servicing distribution center for a time. Many circumstances and considerations were involved in making the decision to convert to Ranitidine capsules and all operational concerns involving these conversions have been addressed.
>
> WIC numbers for these new generic dosage forms are as follows:
>
> Ranitidine 150mg capsules by Par in 60s = 676816
> Ranitidine 300mg capsules by Par in 30s = 676815
>
> This will provide a unique opportunity to have meaningful conversation with your patients and assure them their medication is exactly the same and that the only change is the capsule dosage form. Our patients have come to rely on you, their Walgreen pharmacist, to provide quality generic products and information in a professional manner – this opportunity is no exception.
>
> Thank you.

**Exhibit 6** [W 04526] (emphasis added).

46.     By July 2001, Walgreens had configured its Intercom Plus pharmacy computer

16

system so that all prescriptions for Zantac or generic ranitidine were automatically filled with Par's ranitidine capsules. Walgreens made ranitidine capsules the only form of generic ranitidine readily available to its retail customers, despite the fact that it was dispensing a drug that was not legally substitutable for ranitidine tablets.

47.     Walgreens required its pharmacy employees to fill all Zantac or ranitidine prescriptions (including refills) with Par's capsules regardless of what had been prescribed and in violation of federal and state law and regulations. Walgreens did not have a system to obtain physician or patient authorization for the drug switching, or even a system to notify the physician or patient that a different drug had been dispensed.

48.     Tom Lawlor's July 12, 2001 company-wide email, quoted in full above, falsely informed Walgreens' pharmacists that "ranitidine capsules by Par are AB rated generic products." **Exhibit 6** [W 04526]. In July 2001, Lawlor's false assertions about the bioequivalency of Par's capsules to tablets came to the attention of the Illinois Department of Public Health ("IDPH"). On July 25, 2001, the IDPH issued a written rebuke to Walgreens, concluding that:

> Your communication to Walgreen pharmacists indicated that the *ranitidine* 150 mg and 300 mg capsules intended to be dispensed by Walgreen pharmacists were "AB rated generic products." Please note that the Par ranitidine 150 mg and 300 mg capsules are only rated equivalent to other manufacturers' ranitidine <u>capsules</u> listed in the current edition of the FDA's publication, *Approved Drug Products with Therapeutic Equivalence Evaluations.*

> *      *      *

> To infer that Par ranitidine capsules are "AB rated generic products" with any manufacturer's ranitidine tablets is false and deceptive.

17

**Exhibit 8** [W 00191-92] (emphasis in original).

49. Notwithstanding the warning from the IDPH, Walgreens pharmacies throughout the country continued to unlawfully substitute ranitidine capsules for ranitidine tablets and charge third-party payors amounts far in excess of the MAC for ranitidine tablets.

50. In 2004, after learning that it was under federal investigation for the illegal switching scheme, Walgreens decided to phase out the ranitidine switching. On August 24, 2004, Bill Groth, Walgreens' divisional manager for pharmacy purchasing, sent an email to George Riedl, Walgreens' senior vice-president of the drug store marketing division, which stated:

> FYI. . . .John Ziebell and myself, along with Tom Lawlor had a second meeting with [Walgreens in-house counsel] Bryan Schneider in regard to questions and concerns from government agencies on ranitidine and fluoxetine dosage form conversions. These agencies suggest we are actively switching dosage forms and thus the states are paying higher reimbursement which they view as overcharges to the public. Additionally, they suggest our pharmacists are not calling for physician approval. Today's meeting was as a result of discussions Bryan has had with others within our company and outside counsel and ultimately that groups [sic] recommendation to adjust our policy.

**Exhibit 9** [W 05218-19].

51. As a result of this meeting, beginning in September 2004, Walgreens began to "quietly" fill customers' new ranitidine prescriptions with ranitidine tablets instead of Par's capsules.

52. On November 17, 2004, Lawlor explained in an email:

> On the advice of in-house and outside counsel due to 3 state attorneys general and the US AG suing us — we were advised to quietly convert to the same dosage forms. There is an estimated $5 million hit to the company per year in GP. This decision did not come easily or lightly and was made in FY 2005 — not '04.

18

**Exhibit 10** [W 09542].

53. Because of the lower revenues associated with switching back to tablets, Walgreens approached Par for a future price reduction on several drugs, including ranitidine, so it could recoup lost profits. In a September 21, 2004 email, Frank DeStefano, Walgreens' general merchandise manager, explained:

> FYI. . . .As discussed in the Divisional Review, the impact of the tab-to-tab and cap-to-cap cross reference on ranitidine and fluoxetine is estimated at a gross profit loss of about $9.94 M for FY 2005. In anticipation of this and in order to defray the loss, John Ziebell has gone to Par and Teva to obtain lower costs on both capsules AND tablets for both entities.

**Exhibit 11** [W 05260].

54. To get the price reduction, Walgreens contacted Julie Trendowicz, Par's vice president of sales and marketing, who had responsibility for the Walgreens account and who had participated in the switching pitch made to Walgreens. Trendowicz agreed to the price reductions referenced in DeStefano's email.

55. Getting this price reduction had a significant favorable impact on Walgreens' profit losses. As DeStefano explained in an email to John Ziebell and Heather Zenk:

> Your work on getting price reductions on fluoxetine and ranitidine in response to the 8/27 change in the cross reference on Intercom Plus helped us recover approximately $2.2M annually (defrayed the estimated annual profit loss of $9.94M down to $6.73M) for the company.
>
> OUTSTANDING JOB. . .THANK YOU!!!!

**Exhibit 11** [W 11048].

56. Thus, Par not only conspired with Walgreens to implement the switches, it also

paid millions to reverse the financial consequences after Walgreens decided, under pressure from governmental investigations, to begin discontinuing the illegal switching. Par knew that Walgreens continued to refill prescriptions with capsules for current customers in 2004.

**Defendants Switched Fluoxetine Capsules to Tablets**

57.     Par also implemented a fraudulent scheme to evade reimbursement limits for fluoxetine capsules, the generic form of the brand-name anti-depressant Prozac. Par convinced Walgreens to buy tablets by promoting the huge profits to be made by participating in this illegal drug switching scheme.

58.     During the relevant time period, both brand-name Prozac and generic fluoxetine were prescribed almost exclusively in capsule form. In its 20-mg strength, Prozac was only available as capsules. Eli Lilly, the manufacturer of Prozac, made a 10-mg tablet, but never marketed a 20-mg tablet. Thus, prior to Prozac losing its patent protection on August 1, 2001, all prescriptions for Prozac 20-mg were filled with capsules. Prescriptions for Prozac 10-mg were typically filled with capsules as well. Accordingly, with the expiration of Eli Lilly's Prozac patent looming, numerous generic manufacturers submitted applications to the FDA in order to sell fluoxetine capsules.

59.     Generic manufacturers Alphapharm and Genpharm, on the other hand, began to develop fluoxetine 10-mg and 20-mg tablets, and gave Par the exclusive sales and distribution rights in the United States. Par developed a marketing campaign for fluoxetine tablets, targeting patients, physicians, pharmacists and pharmacies.

60.     Walgreens' Bill Groth, divisional manager for pharmacy purchasing, confirmed

that Par proposed the fluoxetine capsule to tablet switch:

> Par presented. . . .that they were coming out with a [fluoxetine] tablet and would we be interested in making that conversion from a [Prozac] capsule in this case back to a tablet on the fluoxetine tablets.

**Exhibit 5** [pp. 40-41].

61.     Par claimed that fluoxetine tablets were easier to swallow than capsules despite its own contrary marketing for ranitidine emphasizing that capsules were easier to swallow.  For example, in ads and in a presentation to pharmacy customers for fluoxetine tablets, Par claimed that "[Fluoxetine's] small size makes tablets easier to swallow" and that "patients prefer tablets over capsules when they have a preference between the two dosage forms."  **Exhibit 12** [PAR-TX 0006383]

62.     At the same time, when promoting ranitidine capsules, Par claimed that capsules were "easier to swallow."  **Exhibit 7** [W 00068].

63.     But in sworn testimony, Par Vice President Trendowicz confirmed that fluoxetine tablets were marketed by comparing "a Par product that was not subject to a MAC versus a comparison of a non-Par product that was subject to a MAC."  **Exhibit 3** [Day 1, p. 128, lines 13-20].

64.     In December 2002 a federal upper limit price of $0.58 was established for fluoxetine 10-mg capsules and $0.60 for 20-mg capsules.  **Exhibit 13** [FUL Changest to Transmittal No. 37].  States also established maximum allowable costs for fluoxetine capsules that were at or below the FUL as required by federal law and in compliance with federal regulations.

65.     Before the patent on fluoxetine capsules expired, Par knew that there would be competition in the market which would lead to the imposition of federal and state maximum prices.  But Par knew that there would be little or no competition in the fluoxetine tablet market, making price limits on tablets unlikely.

66.     Walgreens reaped the anticipated benefits of the illegal switching.  For example, for the period July 1, 2001 through December 31, 2004, UFCW paid Dominicks an average per unit price of $0.60 for 25,986 units of 20-mg fluoxetine capsules, while it paid Walgreens an average per unit price of $1.30 for 45,128 units of Par's 20-mg fluoxetine  tablets.

67.     Par gave wholesalers and distributors free products or other incentives to engage in a fluoxetine telemarketing program targeting pharmacies on Par's behalf.  Par gave the wholesalers scripts to use when making phone calls that contained Par's key selling point: reimbursement on Par's fluoxetine tablets allowed pharmacies to make huge profits at third-party payors' and the government's expense.

68.     On October 16, 2001, Nick DiMaio, Par's executive vice president of sales and marketing, sent one of these telemarketing scripts to Amerisource, a drug wholesaler, which stated:

> Many third party plans and state agencies are issuing MACs or upper limits on reimbursement on fluoxetine.  Par's 20 mg fluoxetine tablets are priced to allow you to continue to make acceptable profits when filling prescriptions for fluoxetine 20 mg.

**Exhibit 14** [PAR-VA 0109889].

69.     Par knew that pharmacists were the key to a successful fluoxetine switching program.  Because pharmacists are licensed by states, Par had to convince pharmacies like

22

Walgreens that their pharmacists would be willing to switch a fluoxetine tablet for a fluoxetine

or Prozac capsule.  **Exhibit 25** [Scott Tarriff testimony Oct. 23, 2008] ("Q. On what basis did

[Par] believe that the [fluoxetine] tablets could compete with the capsules?  A. I think the

company was hopeful that there would be some pharmacist that would substitute a capsule for a

tablet.").

      70.     Par also relied on "market research" indicating that many pharmacists did not

understand their legal obligations when switching fluoxetine dosage forms:

> · **62%** of chain pharmacists, and **68%** of independent pharmacists polled in a
> recent survey said that they would be willing to dispense tablets, and did not think
> a physician intervention was necessary.

> · **22%** of all pharmacists said that **even if the prescription called for capsules**,
> they would be willing to dispense tablets without a physician intervention.

**Exhibit 12** [PAR-TX 0010412] (emphasis in original).

      71.     In furtherance of this goal, Nick DiMaio, Par's executive vice president of sales

and marketing, hired Pamela Cieplak, a consulting pharmacist with whom DiMaio had a

longstanding business relationship, to conduct a 50-state survey of the laws regarding dosage

form substitution.  **Exhibit 15** [PAR-TX 0001470-91].  Par intended to use the survey as a

marketing tool to convince pharmacies and pharmacists to make the switch.

      72.     Par new that Cieplak had no legal training, but nevertheless did not have its inside

or outside counsel review her work.

      73.     Cieplak also reviewed and interpreted some of the state pharmacy statutes, but did

not review state or federal Medicaid laws concerning drug costs and pricing.

      74.     On February 18, 2001, Cieplak sent DiMaio an email explaining that Texas and

many other states prohibited pharmacists from choosing the dosage form without at least

notifying the physician:

> In many states, it looks like the states want pharmacists to notify the prescribing physician if they dispense a dosage form different from that prescribed (see Texas). . . .So it may be that, at least initially, pharmacists would have to notify prescribers that they were dispensing a tablet instead of a capsule in those states.

**Exhibit 16** [PAR-VA 0923837]

75.     A draft of the state survey was also attached to Cieplak's email.  In her draft,

Cieplak correctly cited the provision of Texas law dealing with dosage form substitution:

> The Texas Administrative Code, Chapter 309 states: "With the patient's consent and notification to the practitioner, a pharmacist may dispense a dosage form of a drug product different from that prescribed, such as a tablet instead of a capsule. . . ."

**Exhibit 17** [0923842].  Cieplak's summary accurately reflects Texas law — if a patient

consents and the pharmacist notifies the prescribing physician, the pharmacist can

dispense a different dosage form.

76.     In the final version of Cieplak's state survey, however, the quoted Texas law does

not appear.  Instead, Cieplak makes the following inaccurate statement about Texas law and its

effect on fluoxetine substitution:

> The law is silent on the issue of generic substitution of different dosage forms.  It is the professional responsibility of the pharmacist to determine the drug product to be selected.

**Exhibit 15** [PAR-TX 0001489].

77.     In addition to misrepresenting state substitution laws, Par misrepresented the

FDA's position in order to convince pharmacies to participate in its fluoxetine switching scheme.

24

In a fluoxetine launch presentation created by Par for Caremark, dated June 11, 2001, Par stated:

> The FDA is stating that our 20 mg tablet is safe, effective, and has the same bioavailability and therapeutic effect as Prozac 20 <u>mg capsule</u>.

**Exhibit 18** [PAR-TX 0006059] (emphasis in original).

78.     Par's statement was false.  The FDA's approval letter for Par's fluoxetine tablets compared tablets with tablets and made no mention of capsules:

> We have completed the review of this abbreviated application and have concluded that the drug is safe and effective for use as recommended in the submitted labeling. Accordingly, the application is approved. The Division of Bioequivalence has determined your fluoxetine hydrochloride tablets, 10 mg and 20 mg to be bioequivalent and, therefore, therapeutically equivalent to the listed drug (Prozac Tablets, 10 mg and 20 mg of Eli Lilly and Company).

**Exhibit 19**.  Several months before Par's presentation, as noted above, the FDA expressly rejected the premise that capsules and tablets were interchangeable.  *See* **Exhibit 1** (Letter from Janet Woodcock, M.D., FDA Center for Drug Evaluation and Research, December 1, 2000).

79.     In addition to marketing the reimbursement differential on fluoxetine tablets, Par offered pharmacies significant financial incentives to participate in the illegal drug switching, including free products or stocking rebates to ensure a certain minimum order quantity.  Par also created what it referred to as "Market Share Conversion Programs," which it offered to all of its major customers, including Walgreens.  Par's objective was to increase the volume of fluoxetine tablets dispensed by inducing pharmacies to "convert" prescriptions for fluoxetine or Prozac capsules to fluoxetine tablets.  The higher the percentage of fluoxetine tablets dispensed versus capsules, the greater the additional rebate that Par's customers would earn.

80.     Par put conditions on the cash payments, requiring customers to agree that they

would utilize Par's fluoxetine as the preferred product for all generic 10-mg, 20-mg, and 40-mg Prozac prescriptions. The agreement with Walgreens stated that "Walgreens agrees to utilize Par's 10mg, 20mg and 40mg Fluoxetine as their primary product for filling generic prescriptions for brand 10mg caps and tabs, 20mg capsules, and 40mg capsules." **Exhibit 20** [W07270]. This meant that whenever a pharmacist received a prescription for fluoxetine or Prozac, Par's fluoxetine tablets would be dispensed regardless of the drug actually prescribed.

81.     As a result of these marketing tactics, Walgreens agreed to buy fluoxetine tablets from Par for the purpose of engaging in the dosage form switching scheme. Walgreens stressed the importance of the fluoxetine switching initiative to its pharmacists. Tom Lawlor of Walgreens stated in an August 3, 2001 email to all pharmacy district managers that "we will be cross-referencing the PAR 10 and 20mg tablets to the brand name 10 and 20mg capsules." **Exhibit 21** [W 06884] (emphasis in original). Lawlor emphasized that:

> We need to focus on making an immediate conversion from Prozac (Lilly/Dista) to fluoxetine on every allowable prescription – refills and new. Please be sure all of your staff is aware of this and that they know the procedures to make these immediate conversions to the generic. Have a plan in place in your store for all of your staff, but especially for the in-window technicians, to make sure your store captures every opportunity the very first time one presents itself.

**Exhibit 21** [W 06884].

82.     Par's then CEO Scott Tarriff, wrote to Walgreens' management commending them for their participation in the fluoxetine program. Tarriff explained that, "Par elected to provide the fluoxetine opportunity to a very select group of customers. Walgreens was selected for its progressive, forward thinking approach to pharmacy." **Exhibit 22** [W00109]

83.     Tarriff's letter went on to state that:

26

> In fact, we believe that John Ziebell is perhaps the most creative and visionary purchasing executive in the industry. This is evidenced by Walgreen's participation in the ranitidine and fluoxetine programs. Par's decision to approach Walgreen with this opportunity was largely influenced by our belief that John had the vision to embrace this concept.

*Id.*

84. By at least August 2001, Walgreens had programmed its pharmaceutical distribution system so that all prescriptions for Prozac or generic fluoxetine would be automatically filled with fluoxetine tablets. Walgreens made Par's fluoxetine tablets the only form of generic fluoxetine available to its retail customers.

85. If a new prescription came in for capsules, Walgreens' pharmacy personnel could only fill it with Par's tablets, requiring its pharmacy staff to fill all Prozac and fluoxetine prescriptions with Par's tablets regardless of what the physician prescribed, in violation of state and federal law. Similarly, refills of Prozac and fluoxetine capsules previously filled with capsules were filled with tablets. Walgreens did not obtain physician or patient authorization for the switches.

86. In a September 21, 2001 email, George Riedl, Walgreens' divisional manager for pharmacy purchasing boasted that:

> All generic [fluoxetine] sku's combined produced $8.3 million in gross profit for August 2001 with store substitution reaching 85%. The 20 mg tablet alone produced $6.4 million in profit making it the #1 Rx profit item in the company.

**Exhibit 21** [W 04618].

87. Similarly, while summarizing some of the items discussed during an April 2002 regional managers meeting, Greg Primuth, a Walgreens district pharmacy supervisor stated:

"Are you 90% on generic Prozac? Profit difference w/20 mg tablets is $64. This should be an automatic." **Exhibit 23** [W 04453]

88.     The conspiracy that Par and Walgreens created and implemented resulted in Walgreens' transmission of fraudulent claims to Plaintiff and members of the Class, either directly or through the PBMs, and receipt by Walgreens of payments far in excess of the MACs in place for the drugs actually prescribed.

89.     As Par intended, Walgreens executives echoed the misrepresentation that Par's fluoxetine tablet was AB-rated to Prozac or fluoxetine capsules in numerous emails to its pharmacy staff. In an August 3, 2001 email to all pharmacies, Tom Lawlor stated: "Fluoxetine tablets, capsules (10 & 20 mg strengths) 40 mg capsules . . . are all AB rated generic equivalents to Prozac (Lilly/Dista). . . .These very high profile, high volume AB rated generic equivalent represents a significant opportunity for all of us in several areas." **Exhibit 21** [W 06684].

90.     As with ranitidine, Par helped to cover the costs of Walgreens' "switch-back" from Par's fluoxetine tablets to capsules in response to the government investigation.

### F.     UFCW has been Injured in its Business and Property

91.     UFCW has been injured in its business and property as a direct and proximate result of Defendants' unlawful switching schemes. An analysis of UFCW's prescription records for ranitidine and fluoxetine demonstrates that, as compared to other chain pharmacies, UFCW paid Walgreens disproportionate amounts for Par's ranitidine and fluoxetine products.

92.     From July 1, 2001 through December 31, 2004, UFCW paid a total of $248,946.93 for its members' ranitidine and fluoxetine prescriptions. Of the total amount, 41%

($101,818.19) was paid to Walgreens and 76% ($188,567.72) was paid to eight large pharmacy chains (including Walgreens). The data shows that UFCW was far more likely to pay for the more expensive forms of the drugs (*i.e.,* those without MACs) when its members went to Walgreens. *See* **Exhibit 26**-A-F (summaries of UFCW transactional data).

### UFCW's Ranitidine Transactions

(**1**)     **Ranitidine Capsules Were More Expensive Than Ranitidine Tablets**

93.     As alleged herein, the tablet form of ranitidine was subject to MAC price limitations while the capsule form was not. As a result, TPPs like UFCW generally paid a much higher price for capsules than for tablets. An analysis of the prices paid by UFCW from July 1, 2001 through December 31, 2004 bears this out. Graphs 1 and 2 below illustrate the average prices UFCW paid for 150-mg and 300-mg ranitidine, in both tablet and capsule form, at the major pharmacy chains (1,000 unit minimum). For example, UFCW paid Dominicks for the highest volume of 150-mg ranitidine *tablets* (23,102 units), and those payments averaged approximately $0.18 per unit. This can be contrasted with the highest volume of 150-mg ranitidine *capsules* (33,246 units), for which UFCW paid Walgreens approximately $.0.52 per unit. *See* Graph 1 below. Similarly, UFCW paid Dominicks for the highest volume of 300-mg ranitidine *tablets* (1,897 units) and those payments averaged approximately $0.26 per unit. This can be contrasted with the highest volume of 300-mg ranitidine *capsules* (2,897 units), for which UFCW paid Walgreens approximately $1.20 per unit. *See* Graph 2 below. The higher price per unit for capsules shows that switching from tablets to capsules caused UFCW to pay greater amounts.



*Graph 1*

**Ranitidine 150 MG Unit Price Comparison of Capsules/Tablets**
**UFCW Average Price Paid Per Unit to the Top 8 Pharmacy Chains (1,000 Unit Minimum)**
*July 1, 2001 – December 31, 2004*



*Graph 2*

**Ranitidine 300 MG Unit Price Comparison of Capsules/Tablets**
**UFCW Average Price Paid Per Unit to the Top 8 Pharmacy Chains (1,000 Unit Minimum)**
*July 1, 2001 – December 31, 2004*

30

     **(2)**    **Walgreens Dispensed the More Expensive Ranitidine Capsules to UFCW Members 91.8% of the time, while Other Leading Pharmacy Chains Dispensed the More Expensive Capsules Less than 1% of the time**

94.     UFCW's transaction records show that, from July 1, 2001 through December 31, 2004, the less expensive ranitidine tablets were dispensed for almost all of the ranitidine transactions at pharmacy chains other than Walgreens and CVS (CVS has also been accused of wrongfully switching ranitidine prescriptions[1]).  As set forth in Table 1 below, Walgreens filled 91.8% of ranitidine prescriptions with the more expensive capsules and only 8.2% with the less expensive tablets (on volume of 39,344 units).  In contrast, 99.8% of ranitidine prescriptions at six other chain pharmacies were filled with the less expensive tablets, while only 0.2% were filled with the more expensive capsules (on volume of 59,694 units).

### TABLE 1
### UFCW RANITIDINE TRANSACTIONS
July 1, 2001 – December 31, 2004

| Pharmacy | 150-mg and 300-mg capsules and tablets | more expensive capsules (units/%) | less expensive tablets (units/%) |
|---|---|---|---|
| Walgreens | 39,344 units | 36,143 (91.8%) | 3201 (8.2%) |
| 6 other leading chains* | 59,964 units | 120 (0.21%) | 59,844 (99.79%) |

*Dominicks, Osco, Kroger, Walmart, Kmart and Target.  CVS excluded from calculations.

95.     As a result, UFCW paid significantly higher amounts to Walgreens than it did to the other pharmacy chains.  Graphs 3 and 4 below compare UFCW members' transactions at

---

[1] On March 18, 2008, the U.S. DOJ announced that CVS entered a $36.7 million settlement with the U.S., 23 states and D.C. to settle allegations that it unlawfully switched ranitidine tablet prescriptions to capsules.  *See* http://www.justice.gov/opa/pr/2008/March/08_crt_214.html.

Walgreens and the seven other pharmacy chains on a dollars and units basis.



**Graph 3**

**Comparison of the Dollars Paid by UFCW**
**For Ranitidine Prescriptions Filled By the Top 8 Pharmacy Chains**

July 1, 2001 – December 31, 2004



96.     As set forth in **Exhibit 26**-D, Par's ranitidine capsules account for the bulk of

UFCW's members' ranitidine transactions at Walgreens.

97.     Before Par and Walgreens embarked on the ranitidine switching scheme alleged

herein, Walgreens dispensed ranitidine tablets manufactured by Mylan Laboratories.  *See*

**Exhibit  6** [W 04526].  In fact, from January 1, 2000 through May 31, 2001, Walgreens filled

UFCW members' ranitidine prescriptions with Mylan's tablets close to 100% of the time

($17,848.35 for 17,945 tablets[2]).  At all pharmacies during this period, UFCW paid $55,862.46 for 73,148 units of 150-mg and 300-mg ranitidine, and ranitidine tablets were dispensed 96.8% of the time ($54,012.88 for 70,773 tablets).  Graph 5 below illustrates the marked shift in the form of ranitidine dispensed by Walgreens to UFCW's members after July 1, 2001, the month the switching program was initiated.



**Graph 5**
**UFCW Ranitidine Transactions with Walgreens Before and After July 1, 2001**

98.     Thus, UFCW's transactional data shows that after July 1, 2001, it was rarely billed for the more expensive capsules when its members filled their ranitidine prescriptions at the chain pharmacies --- unless they went to Walgreens or CVS, where it was virtually assured. This was not because patients with capsule prescriptions coincidentally chose Walgreens, but because Walgreens wrongfully filled prescriptions for tablets with capsules, pursuant to the

---

[2]  As noted above, CMS announced on April 6, 2000 that it was setting a federal upper limit for ranitidine tablets.

scheme alleged herein, so that Defendants could unlawfully profit by evading strict MAC price limitations on tablets.

99.     For example, UFCW member "Timothy" visited a Walgreens Drug Store at 300 E. Main Street, East Peoria, Illinois on August 9, 2002. "Timothy" presented the pharmacist with a 150-mg ranitidine prescription that was entered into Walgreens' Intercom Plus pharmacy computer system and automatically recognized as a prescription for 150-mg ranitidine *capsules*. *See* **Exhibit 6** [W 04526]. Walgreens then sent a transmission over interstate wires to UFCW's PBM, Express Scripts, Inc. ("ESI") in Maryland Heights, Missouri representing that "Timothy" had presented a prescription for sixty, 150-mg ranitidine *capsules*. In response, ESI's computer system, on UFCW's behalf, sent a transmission over interstate wires to the Walgreens Drug Store that: (1) verified "Timothy's" coverage under UFCW's prescription benefits program; and (2) adjudicated the claim in the amount of $32.72 due from UFCW (since there was no MAC on the capsule formulation) and $2.00 due from "Timothy" as a copayment. The $32.72 charge was included in UFCW's payment to ESI. By contrast, the following month, on September 10, 2002, "Timothy" had his ranitidine prescription filled at the Kroger Pharmacy on 201 S. Main Street, East Peoria, Illinois. Kroger filled the prescription properly with sixty, 150-mg ranitidine tablets and UFCW was charged only $9.74 because of MAC limitations.

### UFCW's Fluoxetine Transactions

#### (1)     Fluoxetine Tablets Were More Expensive Than Fluoxetine Capsules

100.     The data for UFCW members' Fluoxetine prescriptions tells exactly the same story. As alleged herein, the capsule form of fluoxetine was subject to MAC price limitations

while the tablet form was not.  As a result, TPPs like UFCW generally paid a much higher price for tablets than for capsules.  An analysis of the prices paid by UFCW during the period July 1, 2001 through December 31, 2004 bears this out.  Graphs 6 and 7 below illustrate the average prices UFCW paid for 10-mg and 20-mg ranitidine, in both tablet and capsule form, at the major pharmacy chains (1,000 unit minimum).  For example, UFCW paid Dominicks for the highest volume of 20-mg fluoxetine *capsules* (25,986 units) and those payments averaged approximately $0.60 per unit.  This can be contrasted with the highest volume of 20-mg fluoxetine *tablets* (45,128 units), for which UFCW paid Walgreens approximately $1.30 per unit.  *See* Graph 6 below.  Similarly, UFCW paid Dominicks for the highest volume of 10-mg fluoxetine *capsules* (3,227 units) and those payments averaged approximately $0.42 per unit.  This can be contrasted with the highest volume of 10-mg fluoxetine *tablets* (8,170 units), for which UFCW paid Walgreens approximately $0.73 per unit.  *See* Graph 7 below.  The higher price per unit for tablets shows that switching from capsules to tablets caused UFCW to pay greater amounts.

**Graph 6**

**Fluoxetine 20 MG Unit Price Comparison of Capsules/Tablets**
**UFCW Average Price Paid Per Unit to the Top 8 Pharmacy Chains (1,000 Unit Minimum)**



**Graph 7**

**Fluoxetine 10 MG Unit Price Comparison of Capsules/Tablets**
**UFCW Average Price Paid Per Unit to Top Pharmacy Chains (1,000 Unit Minimum)**
**July 1, 2001 – December 31, 2004**



(2)    **Walgreens Dispensed the More Expensive Fluoxetine Tablets to UFCW Members 92.8% of the time, while Other Leading Pharmacy Chains Dispensed the More Expensive Tablets Less than 10% of the time.**

101.    UFCWs transaction records show that, from July 1, 2001 through December 31, 2004, the less expensive fluoxetine capsules were dispensed for almost all of the fluoxetine transactions at pharmacy chains other than Walgreens.  As set forth in Table 2 below, Walgreens filled 92.8% of fluoxetine prescriptions with the more expensive tablets and only 7.2% with the less expensive capsules (on volume of 57,435 units).  In contrast, 90.9% of fluoxetine prescriptions at seven other chain pharmacies were filled with less expensive capsules, while only 9.1% were filled with the more expensive tablets (on volume of 80,163 units).

**TABLE 2**

**UFCW 10-mg and 20-mg FLUOXETINE TRANSACTIONS**
July 1, 2001 – December 31, 2004

| Pharmacy | 10-mg and 20-mg capsules and tablets | more expensive tablets | less expensive capsules |
|---|---|---|---|
| Walgreens | 57,435 units | 53,298 (92.8%) | 4,137 (7.2%) |
| 7 other leading chains* | 80,163 units | 7,311 (9.1%) | 72,852 (90.9%) |

*Dominicks, Osco, Kroger, CVS, Walmart, Kmart and Target.

102.    As a result, UFCW paid significantly higher amounts to Walgreens than it did to the other pharmacy chains.  Graphs 8 and 9 below compare UFCW members' transactions at Walgreens and the seven other pharmacy chains on a dollars and units basis.



***Graph 8***

**Comparison of the Dollars Paid by UFCW
For Fluoxetine Prescriptions Filled By the Top 8 Pharmacy Chains**
July 1, 2001 – December 31, 2004



**Graph 9**

**Comparison of the Number of Fluoxetine Units Dispensed
By the Top 8 Pharmacy Chains (All Paid by UFCW)**
July 1, 2001 – December 31, 2004

103.   As set forth in **Exhibit 26**-F, Par's fluoxetine tablets account for the bulk of the

10-mg and 20-mg fluoxetine transactions at Walgreens.

104.   Thus, after the switching program was initiated on July 1, 2001, UFCW was

rarely billed for the more expensive 10-mg and 20-mg tablets when its members filled their

fluoxetine prescriptions at the chain pharmacies -- unless they went to Walgreens where it was

virtually assured.  This was not because patients with 10-mg and 20-mg fluoxetine tablet

prescriptions coincidentally chose Walgreens, but because Walgreens wrongfully filled

prescriptions for capsules with tablets, pursuant to the scheme alleged herein, so that Defendants

could unlawfully profit by evading strict MAC price limitations on the capsules.

105.   For example, UFCW member "Sandra"  had her fluoxetine prescription filled

with 20-mg capsules from August 2001 through January 2004. In her last capsule transaction, on January 11, 2004, she received sixty, 20-mg fluoxetine capsules, made a $4.00 copayment and UFCW was charged $10.30. The next month, however, "Sandra" switched to a Walgreens pharmacy at 5525 W. 159th Street, Oak Forest, Illinois. On February 2, 2004, she filled her fluoxetine prescription at Walgreens and received sixty of Par's 20-mg fluoxetine *tablets*. "Sanda's" copayment was, again, $4.00, but UFCW was charged $74.44. "Sandra" received Par's capsules from Walgreens for the rest of 2004, and UFCW paid the higher prices unrestrained by MAC limitations.

### THE DISCOVERY RULE AND TOLLING OF THE STATUTES OF LIMITATIONS

106. Plaintiff and the Class, in the exercise of reasonable diligence, could not determine that they had been injured by paying for higher priced products that were not prescribed by physicians until, at the earliest, June 4, 2008, when the United States Department of Justice announced Walgreens' agreement to reimburse governmental entities for Medicaid claims. Even then, very few details were released about the alleged schemes. Par's involvement in the ranitidine and fluoxetine schemes did not become public until July, 2011, when the *qui tam* case against Par was unsealed. *United States of America ex rel. Bernard Lisitza v. Par Pharmaceutical Companies, Inc., et al.,* No. 06-c-6131 (N.D. Ill.). The amended complaint in that case, made public for the first time on July 19, 2011, included internal documents evidencing Walgreens' and Par's involvement in the schemes.

107. Plaintiff could not have discovered the allegations underlying the government's investigations, as all relevant pleadings in *United States of America ex rel. Bernard Lisitza v.*

41

*Walgreen Co.*, No. 03-C-00744 (N.D. Ill.) and *United States of America ex rel. Bernard Lisitza v. Par Pharmaceutical Companies, Inc., et al.,* No. 06-c-6131 (N.D. Ill.) were filed under seal. The complaint against Walgreens was not unsealed until June 4, 2008, *see* May 29, 2008 Order [Docket Entry No. 36], and the rest of the court file remains under seal. The complaint against Par was not unsealed until July 19, 2011, *see* July 8, 2011 order [Docket Entry No. 34], and most of the court file remains under seal. The federal False Claims Act ("FCA") requires that, in cases filed by *qui tam* relators, "[t]he complaint shall be filed *in camera*, [and] shall remain under seal for at least 60 days," during which the government may elect to intervene. 31 U.S.C. § 3730(b)(2). Furthermore, "[t]he Government may, for good cause shown, move the court for extensions of the time during which the complaint remains under seal." *Id.* at 3730(b)(3).

108.    Even now, much of the evidence underlying the Government's investigation of Walgreens remains off-limits to Plaintiff, as the FCA also exempts from disclosure under the Freedom of Information Act "[a]ny documentary material, answers to written interrogatories, or oral testimony provided under any civil investigative demand" issued by the Government prior to its election to intervene. 31 U.S.C. § 3733(k).

## CLASS ALLEGATIONS

109.    Plaintiff brings this class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class defined as follows:

> All third-party payors (including insurance companies, employers and union health and welfare funds) in the United States and its territories that, during the period from July 1, 2001 through 2006 (the "Class Period"), paid and/or reimbursed for all or part of prescriptions filled at Walgreens with:

42

(a)      150-mg and 300-mg ranitidine *capsules*; and/or

(b)      10-mg and 20-mg fluoxetine *tablets.*

Excluded from the Class are Defendants and their respective subsidiaries and affiliates, and all governmental entities.

110.    The members of the Class are so numerous that joinder of all members is impracticable.  Walgreens has thousands of retail pharmacies and, at a minimum, hundreds of thousands of prescriptions for the drugs at issue were dispensed by Walgreens during the Class Period and were paid for by thousands of TPPs across the country.

111.     Defendants' unlawful conduct and trade practices have targeted and affected all members of the Class in a similar manner, *i.e.*, they overpaid for ranitidine and fluoxetine because the prescriptions of members, employees and insureds were unlawfully switched from the less-expensive dosage forms to the more expensive dosage forms.  Among the questions of law and fact common to the Class are:

(a)      whether Walgreens, pursuant to an agreement with Par, adopted a corporate policy of filling prescriptions with a different dosage form than the one indicated on the prescription without obtaining the prescribing physician's authorization;

(b)      whether Walgreens' pharmaceutical distribution system was set up to make it difficult or impossible to fill a prescription for ranitidine and fluoxetine dosage forms that were subject to MACs and to instead fill said prescriptions with dosage forms manufactured by Par that were not subject to MACs;

43

(c)      whether Defendants defrauded and conspired to defraud Plaintiff and the Class by using the U.S. mail and interstate wire transmissions to:

i)  unlawfully profit from the sale of ranitidine capsules by misrepresenting that prescriptions written for low-cost ranitidine tablets had been written for high-priced ranitidine capsules, filling said prescriptions with ranitidine capsules, and charging purchasers and payors the higher prices for the capsules; and

ii) unlawfully profit from the sale of fluoxetine tablets by misrepresenting that prescriptions written for low-cost fluoxetine capsules had been written for high-priced fluoxetine tablets, filling said prescriptions with fluoxetine tablets, and charging purchasers and payors the higher prices for the tablets.

(d)      the amount of the overcharges or amounts paid or reimbursed by members of the Class over and above the amounts they would have paid or reimbursed but for Defendants' illegal acts as alleged herein; and

(e)      whether Defendants violated 18 U.S.C. §§ 1962(c) and (d).

112.      Plaintiff's claims are typical of those of the Class they represent because Plaintiff and all of the Class members were injured in the same manner by Defendants' unlawful acts and practices, *i.e.*, they paid for prescriptions wrongfully filled with dosage forms that were not subject to MACs.

113.      Plaintiff will fully and adequately protect the interests of all members of the Class.  Plaintiff has retained counsel who are experienced in pharmaceutical class action

44

litigation.  Plaintiff has no interests which are adverse to, or in conflict with, other members of the Class.

114.    The questions of law and fact common to the members of the Class predominate over any questions which may affect only individual members.

115.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiff knows of no difficulty likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## COUNT I

### VIOLATION OF 18 U.S.C. § 1962(c)
### Racketeer Influenced and Corrupt Organizations Act
### (Against Walgreens)

116.    Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

117.    This action is brought under 18 U.S.C. § 1964(c) for violation of 18 U.S.C. § 1962(c).

118.    At all times material to this Complaint, Walgreens was a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

119.    As more fully set forth below, Walgreens conducted, or participated in the conduct of the affairs of an association-in-fact enterprise, through a pattern of racketeering activity, specifically acts of mail and wire fraud.

### The Walgreens/Par/Hrp Enterprise

120.     Walgreens and Par referred to their relationship as the "Walgreens/Par/Hrp" (*i.e.*, health resource partnership). **Exhibit 7** [W00066].  For purposes of this claim, the "Walgreens/Par/Hrp Enterprise" was an ongoing and continuing business organization that operated from approximately 2001 through 2006 and consisted of Walgreens, Par and senior management personnel from both companies, including Nick DiMaio (Par's top marketing executive), Scott Tarriff (Par's President and CEO), Julie Trendowicz (Par's vice president of sales and marketing), Bill Groth (Walgreens' divisional manager for pharmacy purchasing), Tom Lawlor (Walgreens' director of pharmacy marketing), John Ziebell (Walgreens' chief purchaser of generic drugs) and George Riedl (Walgreen's Senior Vice-President of Drug Store Marketing Division).  The Walgreens/Par/Hrp Enterprise constituted an association-in-fact "enterprise" as the term is defined in 18 U.S.C. §§ 1961(4) and 1962(c).

121.     The companies and individuals that constitute the Walgreens/Par/Hrp Enterprise were associated for the common purpose of: (1) unlawfully profiting from the sale of ranitidine capsules by misrepresenting that prescriptions written for low-cost ranitidine tablets had been written for high-priced ranitidine capsules, filling said prescriptions with ranitidine capsules, and charging purchasers and third-party payors the higher prices for the capsules; and (2) unlawfully profiting from the sale of fluoxetine tablets by misrepresenting that prescriptions written for low-cost fluoxetine capsules had been written for high-priced fluoxetine tablets, filling said prescriptions with fluoxetine tablets, and charging purchasers and third-party payors the higher prices for the tablets.

46

122.    Par initiated the Walgreens/Par/Hrp Enterprise because there was little or no commercial demand for its FDA-approved generic ranitidine capsules and fluoxetine tablets. This was because physicians had a strong preference for prescribing ranitidine tablets and fluoxetine capsules, respectively, and that preference resulted in market competition by several manufacturers, highly competitive pricing and corresponding restrictions on the amounts that governmental programs and commercial health benefit providers would reimburse for these drugs, *i.e.,* FULs and MACs.  Because there was little or no demand or competition for generic ranitidine capsules and generic fluoxetine tablets, on the other hand, prices and reimbursements were not restrained by FULs or MACs.  As Bill Groth (Walgreens' Divisional Manager of Pharmacy Purchasing) explained with respect to ranitidine in a May 15, 2001 email: "[S]ince these items [*i.e*., 150mg and 300mg tablets] are highly competitive 3rd party payors and the government have created MAC (maximum allowable cost) pricing which limits our reimbursement…..By switching to a capsule dosage form we have discovered that there are not currently constraints on MAC …." **Exhibit 4** [W11022] (ellipses in original).

123.    Walgreens joined the Walgreens/Par/Hrp Enterprise so that it could garner unlawful profits on sales of ranitidine capsules and fluoxetine tablets that were not subject to FUL or MAC reimbursement limitations.  Competitive pricing for ranitidine tablets and fluoxetine capsules (*i.e.,* FULs and MACs) resulted in much smaller profit margins when Walgreens filled these prescriptions.  For example, Groth's May 15, 2001 email relative to ranitidine concluded that "[a]t a 50% conversion rate increased GP [gross profit] dollars could achieve approximately $1.66MM per month…" *Id*.

124.     Par could not make significant profits on its generic ranitidine capsules and generic fluoxetine tablets because there was little or no commercial demand for those drug forms.  For Par to convince physicians to alter their prescribing habits, it would have had to engage in a marketing effort and hire marketing personnel.  These are steps rarely taken by generic pharmaceutical manufacturers because their products are seldom patent protected, and a successful marketing effort would likely result in several generic manufacturers entering the market and "free riding" on the marketing effort, thereby limiting any significant profit potential. In an Alphapharm email dated May 9, 2000, for example, it was noted that "PAR certainly does not have the marketing muscle to establish a new market for the [fluoxetine] tablet ....." **Exhibit 24** [A 025902].

125.     Because it was economically impracticable for Par and Walgreens to realize the higher profits they sought on ranitidine capsule and fluoxetine tablet sales through legitimate means, Par, Walgreens and key management personnel from both companies, combined to form the association-in-fact Walgreens/Par/Hrp Enterprise, through which they unlawfully *forced* sales of high-priced ranitidine capsules and fluoxetine tablets.

126.     Par's role in the Walgreens/Par/Hrp Enterprise was to supply the ranitidine capsules and fluoxetine tablets to Walgreens.  Walgreens' role was to use its national computer system (Intercom Plus) and distribution facilities to fill prescriptions written for ranitidine tablets with ranitidine capsules by: (i) misrepresenting to its pharmacists (among others) that the ranitidine capsules were AB-rated to tablets; and (ii) misrepresenting to PBMs and health

benefits providers (among others) that ranitidine prescriptions had been written for capsules when the overwhelming majority were actually written for tablets.

127. Walgreens also used its national computer system (Intercom Plus) and distribution facilities to fill prescriptions written for fluoxetine capsules with fluoxetine tablets by: (i) misrepresenting to its pharmacists (among others) that the fluoxetine tablets were AB-rated to capsules; and (ii) misrepresenting to PBMs and health benefits providers (among others) that fluoxetine prescriptions had been written for tablets when the overwhelming majority were actually written for capsules.

## Walgreens Conducted the Affairs of the Enterprise

128. Walgreens conducted and/or participated in the conduct of the affairs of the Walgreens/Par/Hrp Enterprise. Specifically, Walgreens operated and managed the business of the Enterprise through high level personnel, including Bill Groth, Tom Lawlor, John Ziebell and George Riedl, who caused Walgreens to engage in the unlawful prescription switching programs. Par targeted Walgreens as a partner in the prescription switching schemes because Walgreens had a nationwide computer system that could automatically implement unlawful switching of prescriptions, regardless of what the physicians actually prescribed. Walgreens did not have any system in place to obtain physician or patient authorization for the drug switching, or even a system to notify the physician or patient that the prescribed drug had been switched. Walgreens' legitimate business affairs included filling physicians' prescriptions as they were written or, when authorized, substituting generic versions of branded drugs. When unlawfully switching ranitidine and fluoxetine prescriptions, however, Walgreens was participating in the operation

and management of the Walgreens/Par/Hrp Enterprise rather than its own legitimate affairs. Walgreens exerted control over the Walgreens/Par/Hrp Enterprise and, in violation of Section 1962(c), Walgreens conducted or participated in the conduct of the affairs of the enterprise, directly or indirectly, as described herein.

**Walgreens' Use of the U.S. Mails and Interstate Wire Facilities**

129. Walgreens' illegal conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents and information, products and funds by U.S. mail and interstate wire facilities.

130. Walgreens' participation in the affairs of the Walgreens/Par/Hrp Enterprise was orchestrated out of Walgreens' corporate headquarters in Deerfield, Illinois and necessarily required that management personnel in Deerfield communicate directly and frequently by the U.S. mails and interstate wire facilities with Walgreens' pharmacies and facilities in forty-nine states, the District of Columbia and Puerto Rico, as well as Par personnel in New Jersey and New York.

131. Many of the precise dates of Walgreens' uses of the U.S. mails and interstate wire facilities (and corresponding acts of mail and wire fraud) have been hidden and cannot be alleged without access to Defendants' books and records. Indeed, an essential part of the successful operation of the prescription switching schemes alleged herein depended upon secrecy, and Walgreens took deliberate steps to conceal its wrongdoing, including discontinuing its unlawful switching when governmental authorities became suspicious. Nevertheless, Plaintiff can describe specific occasions on which RICO predicate acts of mail fraud and wire fraud occurred,

and can explain how those acts were in furtherance of the prescription switching schemes, as described below.

132.     The attached exhibits include several concrete examples of foreseeable uses of interstate wire communications and/or the U.S. mail in furtherance of Defendants' fraudulent schemes.  For example:

| Date/ Bates#/ Exhibit# | Method of Communi-cation | From (name/company/ location) | To (name/company /location) | Nature of communication in furtherance of schemes |
|---|---|---|---|---|
| 7/12/01 W04526 Ex. 6 | email | Tom Lawlor Walgreens Deerfield, IL | All Walgreens Pharmacies Nationwide<br><br>cc. All Walgreens District Mangers Nationwide | message sent to all Walgreens stores regarding ranitidine capsule substitution program and falsely representing that capsules are AB-rated to tablets |
| 7/30/01 W07270 Ex. 20 | facsimile | John Ziebell Walgreens Deerfield, IL | Julie Trendowicz Par Spring Valley, NY | agreement for Walgreens to dispense Par's 10-mg and 20-mg fluoxetine tablets as primary product for filling prescriptions for 10-mg capsules and tablets and 20mg capsules |
| 8/3/01 W06884 Ex. 21 | email | Tom Lawlor Walgreens Deerfield, IL | All Walgreens Pharmacies Nationwide<br><br>All Walgreens District Mangers Nationwide<br><br>OpsVPs Walgreens | informing all of switching program and stating "we will be cross-referencing the PAR 10 and 20mg tablets to the brand name 10 and 20mg capsules." |

| | | | Deerfield, IL<br><br>Bcc. Jim Ash<br>Walgreens<br>Deerfield, IL | |
|---|---|---|---|---|
| 8/23/01<br>W00109<br>Ex. 22 | U.S. Mail,<br>fax, or email | Scott Tarriff<br>Par<br>Spring Valley, NY | George Riedl<br>Walgreens<br>Deerfield, IL<br><br>Cc. Bill Grath (sic<br>Groth)<br>J. Karlin<br>J. Rein<br>J. Zeibell<br>Walgreens<br>Deerfield, IL | thanking Walgreens<br>for participation in<br>"ranitidine and<br>fluoxetine programs"<br>and assuring<br>Walgreens that they<br>"will find additional<br>programs to<br>collaborate on." |

133.    In response to directives from senior management, including Bill Groth, Tom Lawlor, John Ziebell and George Riedl, Walgreens configured its Intercom Plus pharmacy computer system so that communications over interstate wire facilities caused Walgreens pharmacists throughout the country to fill prescriptions written for Zantac or generic ranitidine tablets with Par's ranitidine capsules, and to fill prescriptions written for Prozac or generic fluoxetine capsules with Par's fluoxetine tablets.

134.    In 2001, for example, UFCW's PBM was National Prescription Administrators, Inc. ("NPA"), which was based in East Hanover, New Jersey.  When a UFCW member purchased a prescription at a pharmacy, such as Walgreens, the pharmacist transmitted the claim through interstate wire transmissions to NPA in East Hanover, New Jersey, which provided real time verification of eligibility for participation in UFCW's prescription benefit plan, identified the amount of copayment due, and adjudicated the claim on behalf of UFCW.  Each of UFCW's

PBMs utilized technology for on-line, real time claims processing and adjudication at the point-of-sale.[3] Thus, every time Walgreens submitted a claim for reimbursement to UFCW's PBM, Walgreens represented that the amount claimed was for the drug actually prescribed by the covered individual's physician. Because electronic claims are submitted and adjudicated instantaneously, Walgreens made these representations and submitted claims to the PBMs over interstate wire facilities on a daily basis.

135. Based upon Walgreens' representations, UFCW's PBM adjudicated the claims and UFCW immediately became obligated to pay those claims. UFCW's PBM sent UFCW a breakdown of what it owed for prescriptions purchased at Walgreens, and UFCW wired those funds to its PBM as its payment agent for reimbursement to Walgreens. Including UFCW's transactions, Walgreens received money -- the wrongful proceeds of the prescription switching schemes -- sent by U.S. mails and/or interstate wire facilities on thousands of occasions.

## Walgreens' Pattern of Racketeering Activity

136. Walgreens conducted and participated in the affairs of the Walgreens/Par/Hrp Enterprise through a pattern of racketeering activity, including the above-described acts which are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud. On thousands of separate occasions during the five year class period, Walgreens

---

[3] In 2002, NPA was purchased by ESI, which continued as UFCW's PBM through December 1, 2003. ESI is a Delaware corporation with its principal place of business in Maryland Heights, Missouri. From January 1, 2004 through the end of the Class Period (December 31, 2006), UFCW's PBM was National Medical Health Card Systems, Inc. ("NMHC"), which was headquartered in Port Washington, New York, with service centers in Latham, New York and Little Rock, Arkansas.

used the U.S. mails or interstate wire facilities in furtherance of the ranitidine and fluoxetine schemes. Each of these fraudulent mailings and interstate wire transmissions constitute "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B). The last act of racketeering activity occurred within ten years of prior acts of racketeering activity. Collectively, these violations constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5), in which Walgreens intended to defraud Plaintiff, members of the Class and other intended victims of the schemes.

137.    The fraudulent and unlawful prescription switching schemes misrepresented that prescriptions written for low-cost dosage forms of ranitidine and fluoxetine had been written for high-priced dosage forms manufactured by Par so that Walgreens and Par could reap massive unlawful profits. The schemes were calculated and intentionally crafted to ensure that Plaintiff and members of the Class would make overpayments for these prescriptions. In designing and implementing the schemes, Walgreens was at all times cognizant of the fact that Plaintiff, members of the Class and their agents (*i.e.*, PBMs) would rely on Walgreens' integrity and observance of the contracts and laws governing the filling of prescriptions for controlled substances. By intentionally and systematically misrepresenting that prescriptions were written for high-priced dosage forms (when they were not) and by failing to disclose these practices to patients, physicians, health benefit providers (including government programs) and PBMs, Walgreens engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

138. Walgreens' racketeering activities amounted to a common course of conduct, with similar pattern and purpose, intended to deceive Plaintiff and members of the Class. Each separate use of the U.S. mails or interstate wire facilities employed by Walgreens was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including Plaintiffs and members of the Class. Walgreens engaged in the pattern of racketeering activity for the purpose of conducting the business affairs of the Walgreens/Par/Hrp Enterprise.

### Walgreens' Motive

139. Walgreens' motive for participating in the affairs of the Walgreens/Par/Hrp Enterprise was the prospect of reaping many millions of dollars in additional annual profits by dispensing and billing for high-priced Par products in place of the low-cost drugs actually prescribed by physicians. For example, Par's presentation to Walgreens showed how Walgreens' participation in the schemes could result in total annual profits on ranitidine of $80,400,656 (for 150mg capsules) as compared to $5,143,588 (for 150mg tablets). **Exhibit 2** [Par-Tx 0000163].

### Damages Caused by the Prescription Switching Schemes

140. Walgreens' violation of federal law and its pattern of racketeering activity have directly and proximately caused Plaintiff and members of the Class to be injured in their business and property because Plaintiff and members of the Class have paid many millions of dollars for high-priced ranitidine capsules and fluoxetine tablets that were not prescribed by physicians. Plaintiff and members of the Class made the payments based on, and in reliance on, Walgreens'

55

representations that ranitidine capsules and fluoxetine tablets had been prescribed to the patients in question.

WHEREFORE, Plaintiff requests judgment in its and the Class's favor, and against Walgreens, and for the following relief:

(a) Compensatory damages in the amount to be determined at trial;

(b) Treble the amount of compensatory damages;

(c) Prejudgment interest along with the costs of bringing suit, including reasonable attorneys' fees; and

(d) Such other and further relief as the Court deems just and equitable.

## COUNT II

**VIOLATION OF 18 U.S.C. § 1962(c)**
**Racketeer Influenced and Corrupt Organizations Act**
**(Against Par)**

141. Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

142. This action is brought under 18 U.S.C. § 1964(c) for violation of 18 U.S.C. § 1962(c).

143. At all times material to this Complaint, Par was a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

144. As more fully set forth below, Par conducted, or participated in the conduct of the affairs of an association-in-fact enterprise, through a pattern of racketeering activity, specifically acts of mail and wire fraud.

56

## **The Walgreens/Par/Hrp Enterprise**

145.     Walgreens and Par referred to their relationship as the "Walgreens/Par/Hrp" (*i.e.*, health resource partnership).  **Exhibit 7** [W00066].  For purposes of this claim, the "Walgreens/Par/Hrp Enterprise" was an ongoing and continuing business organization that operated from approximately 2001 through 2006 and consisted of Walgreens, Par and senior management personnel from both companies, including Nick DiMaio (Par's top marketing executive), Scott Tarriff (Par's President and CEO), Julie Trendowicz (Par's vice president of sales and marketing), Bill Groth (Walgreens' divisional manager for pharmacy purchasing), Tom Lawlor (Walgreens' director of pharmacy marketing), John Ziebell (Walgreens' chief purchaser of generic drugs), and George Riedl (Walgreen's Senior Vice-President of Drug Store Marketing Division).  The Walgreens/Par/Hrp Enterprise constituted an association-in-fact "enterprise" as the term is defined in 18 U.S.C. §§ 1961(4) and 1962(c).  The companies and individuals that constitute the Walgreens/Par/Hrp Enterprise were associated for the common purpose of: (1) unlawfully profiting from the sale of ranitidine capsules by misrepresenting that prescriptions written for low-cost ranitidine tablets had been written for high-priced ranitidine capsules, filling said prescriptions with ranitidine capsules, and charging purchasers and third-party payors the higher prices for the capsules; and (2) unlawfully profiting from the sale of fluoxetine tablets by misrepresenting that prescriptions written for low-cost fluoxetine capsules had been written for high-priced fluoxetine tablets, filling said prescriptions with fluoxetine tablets, and charging purchasers and third-party payors the higher prices for the tablets.

146.    Par initiated the Walgreens/Par/Hrp Enterprise because there was little or no commercial demand for its FDA-approved generic ranitidine capsules and fluoxetine tablets. This was because physicians had a strong preference for prescribing ranitidine tablets and fluoxetine capsules, respectively, and that preference resulted in market competition by several manufacturers, highly competitive pricing and corresponding restrictions on the amounts that governmental programs and commercial health benefit providers would reimburse for these drugs, *i.e.,* FULs and MACs.  Because there was little or no demand or competition for generic ranitidine capsules and generic fluoxetine tablets, on the other hand, prices and reimbursements were not restrained by FULs or MACs.  As Bill Groth (Walgreens' Divisional Manager of Pharmacy Purchasing) explained with respect to ranitidine in a May 15, 2001 email: "[S]ince these items [*i.e*., 150mg and 300mg tablets] are highly competitive 3rd party payors and the government have created MAC (maximum allowable cost) pricing which limits our reimbursement…..By switching to a capsule dosage form we have discovered that there are not currently constraints on MAC …."  **Exhibit 4** [W11022] (ellipses in original).

147.    Walgreens joined the Walgreens/Par/Hrp Enterprise so that it could garner unlawful profits on sales of ranitidine capsules and fluoxetine tablets that were not subject to FUL or MAC reimbursement limitations.  Competitive pricing for ranitidine tablets and fluoxetine capsules (*i.e.,* FULs and MACs) resulted in much smaller profit margins when Walgreens filled these prescriptions.  For example, Groth's May 15, 2001 email relative to ranitidine concluded that "[a]t a 50% conversion rate increased GP [gross profit] dollars could achieve approximately $1.66MM per month…"  *Id.*

148.     Par could not make significant profits on its generic ranitidine capsules and generic fluoxetine tablets because there was little or no commercial demand for those drug forms.  In order for Par to convince physicians to alter their prescribing habits, it would have had to engage in a marketing effort and hire marketing personnel.  These are steps rarely taken by generic pharmaceutical manufacturers because their products are seldom patent protected, and a successful marketing effort would likely result in several generic manufacturers entering the market and "free riding" on the marketing effort, thereby limiting any significant profit potential. In an Alphapharm email dated May 9, 2000, for example, it was noted that "PAR certainly does not have the marketing muscle to establish a new market for the [fluoxetine] tablet ….." **Exhibit 24** [A 025902].

149.     Because it was economically impracticable for Par and Walgreens to realize the higher profits they sought on ranitidine capsule and fluoxetine tablet sales through legitimate means, Par, Walgreens and key management personnel from both companies, combined to form the association-in-fact Walgreens/Par/Hrp Enterprise, through which they unlawfully *forced* sales of high-priced ranitidine capsules and fluoxetine tablets.

150.     Par's role in the Walgreens/Par/Hrp Enterprise was to supply the ranitidine capsules and fluoxetine tablets to Walgreens.  Walgreens' role was to use its national computer system (Intercom Plus) and distribution facilities to fill prescriptions written for ranitidine tablets with ranitidine capsules by: (i) misrepresenting to its pharmacists (among others) that the ranitidine capsules were AB-rated to tablets; and (ii) misrepresenting to PBMs and health

benefits providers (among others) that ranitidine prescriptions had been written for capsules when the overwhelming majority were actually written for tablets.

151.    Walgreens also used its national computer system (Intercom Plus) and distribution facilities to fill prescriptions written for fluoxetine capsules with fluoxetine tablets by: (i) misrepresenting to its pharmacists (among others) that the fluoxetine tablets were AB-rated to capsules; and (ii) misrepresenting to PBMs and health benefits providers (among others) that fluoxetine prescriptions had been written for tablets when the overwhelming majority were actually written for capsules.

### Par Conducted the Affairs of the Enterprise

152.    Par conducted and/or participated in the conduct of the affairs of the Walgreens/Par/Hrp Enterprise.  Specifically, Par operated and managed the business of the Enterprise through high level personnel, including Nick DiMaio, Scott Tarriff and Julie Trendowicz, who proposed the schemes to Walgreens and enticed Walgreens' participation by demonstrating the much higher profits available under the switching schemes.  Par targeted Walgreens as a partner in the prescription switching schemes because Walgreens had a nationwide computer system that could automatically implement unlawful switching of prescriptions, regardless of what the physicians actually prescribed.  Walgreens did not have any system in place to obtain physician or patient authorization for the drug switching, or even a system to notify the physician or patient that the prescribed drug had been switched.  Par's legitimate business affairs included developing, manufacturing, marketing and distributing generic pharmaceutical products.  By combining with Walgreens to engage in the unlawful

switching of ranitidine and fluoxetine prescriptions, however, Par was participating in the operation and management of the Walgreens/Par/Hrp Enterprise rather than its own legitimate affairs. Par exerted control over the Walgreens/Par/Hrp Enterprise and, in violation of Section 1962(c), Walgreens conducted or participated in the conduct of the affairs of the enterprise, directly or indirectly, as described herein.

### U.S. Mails and Interstate Wire Facilities

153. Par's illegal conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents and information, products and funds by U.S. mail and interstate wire facilities.

154. Par's participation in the affairs of the Walgreens/Par/Hrp Enterprise was orchestrated out of Par's corporate headquarters in Woodcliff Lake, New Jersey and its facilities in Spring Valley, New York, and necessarily required that management personnel communicate directly and frequently by the U.S. mails and interstate wire facilities with Walgreens' headquarters in Deerfield, Illinois. Many of the precise dates of Par's uses of the U.S. mails and interstate wire facilities (and corresponding acts of mail and wire fraud) have been hidden and cannot be alleged without access to Defendants' books and records. Indeed, an essential part of the successful operation of the prescription switching schemes alleged herein depended upon secrecy, and Par took deliberate steps to conceal its wrongdoing, including compensating Walgreens for anticipated lost profits under the schemes when Walgreens refrained from some of the unlawful switching in response to governmental investigations into the practices. Nevertheless, Plaintiff can describe specific occasions on which RICO predicate acts of mail

fraud and wire fraud occurred, and explain how those acts were in furtherance of the prescription switching schemes, as described below.

155. The attached exhibits include several concrete examples of foreseeable uses of interstate wire communications and/or the U.S. mail in furtherance of Defendants' fraudulent schemes. For example:

| Date/ Bates#/ Exhibit# | Method of Communi- cation | From (name/company/ location) | To (name/company /location) | Nature of communication in furtherance of schemes |
|---|---|---|---|---|
| 7/12/01 W04526 Ex. 6 | Email | Tom Lawlor Walgreens Deerfield, IL | All Walgreens Pharmacies Nationwide<br><br>cc. All Walgreens District Mangers Nationwide | message sent to all Walgreens stores regarding ranitidine capsule substitution program and falsely representing that capsules are AB-rated to tablets |
| 10/16/01 PAR-VA 0109889 Ex. 14 | Email | Nick DiMaio Par Woodcliff Lake, NJ | Sam Vossenberg Amerisource Valley Forge, PA<br><br>Lyn Pickford Par Woodcliff, NJ | explaining how TPPs are issuing MACs on fluoxetine and that Par's 20mg tablets are price to allow "acceptable profits" when filling 20mg prescriptions |
| 2/18/01 PAR-VA 0923837 Exs. 16 - 17. | Email | Pamela Cieplak Cieplak Research Inc. Fairfax, Virginia | Nick DiMaio Par Woodcliff Lake, NJ | communication regarding state laws and regulations regarding substituting different dosage forms and attaching draft survey with accurate information regarding states such as Texas |

| | | | | |
|---|---|---|---|---|
| 7/30/01<br>W07270<br>Ex. 20 | Facsimile | John Ziebell<br>Walgreens<br>Deerfield, IL | Julie Trendowicz<br>Par<br>Spring Valley, NY | agreement for Walgreens to use Par's 10-mg and 20-mg fluoxetine tablets as primary product for filling prescriptions for 10-mg capsules and tablets and 20mg capsules. |
| 8/3/01<br>W06884<br>Ex.  21 | Email | Tom Lawlor<br>Walgreens<br>Deerfield, IL | All Walgreens Pharmacies Nationwide<br><br>All Walgreens District Mangers Nationwide<br><br>OpsVPs Walgreens Deerfield, Il<br><br>Bcc. Jim Ash Walgreens Deerfield, IL | informing all of switching program and stating "we will be cross-referencing the PAR 10 and 20mg tablets to the brand name 10 and 20mg capsules." |
| 8/23/01<br>W00109<br>Ex. 22 | Mail, fax, or email | Scott Tarriff<br>Par<br>Spring Valley, NY | George Riedl<br>Walgreens<br>Deerfield, IL<br><br>Cc. Bill Grath (sic Groth)<br>J. Karlin<br>J. Rein<br>J. Zeibell<br>Walgreens<br>Deerfield, IL | thanking Walgreens for participation in "ranitidine and fluoxetine programs" and assuring Walgreens that they "will find additional programs to collaborate on." |

156.    In furtherance of the schemes, Walgreens configured its Intercom Plus pharmacy

computer system so that communications over interstate wire facilities caused Walgreens

pharmacists throughout the country to fill prescriptions written for Zantac or generic ranitidine tablets with Par's ranitidine capsules, and to fill prescriptions written for Prozac or generic fluoxetine capsules with Par's fluoxetine tablets. *See, e.g.*, ¶ 46.

157.    As a result of Par's agreements to supply Walgreens with ranitidine capsules and fluoxetine tablets to dispense pursuant to the schemes, Walgreens paid Par for those products utilizing the U.S. mails and/or interstate wire facilities.

### Par's Pattern of Racketeering Activity

158.    Par conducted and participated in the affairs of the Walgreens/Par/Hrp Enterprise through a pattern of racketeering activity, including above-described acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud. During the five year Class Period, Par engaged in thousands of separate instances of use of the U.S. mails or interstate wire facilities in furtherance of the schemes. Each of these fraudulent mailings and interstate wire transmissions constitute "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B). The last act of racketeering activity occurred within ten years of prior acts of racketeering activity. Collectively, these violations constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5), in which Par intended to defraud Plaintiff, members of the Class and other intended victims of the schemes.

159.    The fraudulent and unlawful prescription switching schemes misrepresented that prescriptions written for low-cost dosage forms of ranitidine and fluoxetine had been written for high-priced dosage forms manufactured by Par so that Walgreens and Par could reap massive unlawful profits. The schemes was calculated and intentionally crafted to ensure that Plaintiff

and members of the Class would make overpayments for these prescriptions. In designing and implementing the schemes, Par was at all times cognizant of the fact that Plaintiff, members of the Class and their agents (*i.e.*, PBMs) would rely on Walgreens' integrity and observance of the contracts and laws governing the filling of prescriptions for controlled substances. By intentionally and systematically misrepresenting that prescriptions were written for high-priced dosage forms (when they were not) and by failing to disclose these practices to patients, physicians, health benefit providers (including government programs) and PBMs, Walgreens, at Par's behest, engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

160. Par's racketeering activities amounted to a common course of conduct, with similar pattern and purpose, intended to deceive Plaintiff and members of the Class. Each separate use of the U.S. mails or interstate wire facilities employed by Par was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including Plaintiffs and members of the Class. Par engaged in the pattern of racketeering activity for the purpose of conducting the business affairs of the Walgreens/Par/Hrp Enterprise.

## Par's Motive

161. Par's motive for participating in the affairs of the Walgreens/Par/Hrp Enterprise was the prospect of reaping many millions of dollars in additional annual profits by dispensing and billing for high-priced Par products in place of the low-cost drugs actually prescribed by physicians. For example, Par's presentation to Walgreens showed how Walgreens' participation

65

in the scheme could result in total annual profits on ranitidine of $80,400,656 (for 150mg capsules) as compared to $5,143,588 (for 150mg tablets). **Exhibit 2** [Par-Tx 0000163]. Par's unit price for ranitidine capsules was five times more than its competitors' prices for ranitidine tablets, *id.*, but it's involvement with the Walgreens/Par/Hrp Enterprise was designed to fraudulent maximize ranitidine capsule sales nonetheless.

### Damages Caused by the Prescription Switching Schemes

162.    Par's violation of federal law and its pattern of racketeering activity have directly and proximately caused Plaintiff and members of the Class to be injured in their business and property because Plaintiff and members of the Class have paid many millions of dollars for high-priced ranitidine capsules and fluoxetine tablets that were not prescribed by physicians. Plaintiff and members of the Class made the payments based on, and in reliance on, Walgreens' representations that ranitidine capsules and fluoxetine tablets had been prescribed to the patients in questions.

WHEREFORE, Plaintiff requests judgment in its and the Class's favor, and against Par, and for the following relief:

(a) Compensatory damages in the amount to be determined at trial;

(b) Treble the amount of compensatory damages;

(c) Prejudgment interest along with the costs of bringing suit, including reasonable attorneys' fees; and

(d) Such other and further relief as the Court deems just and equitable.

## COUNT III

### VIOLATION OF 18 U.S.C. § 1962(d)
### Racketeer Influenced and Corrupt Organizations Act
### (Against Walgreens)

163.    Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

164.    This action is brought under 18 U.S.C. § 1964(c) for violation of 18 U.S.C. § 1962(d).

165.    As set forth herein, Walgreens agreed and conspired with various persons, including Par, to violate 18 U.S.C. § 1962(c) by directly and indirectly conducting and participating in the conduct of the affairs of the Walgreens/Par/Hrp Enterprise through a pattern of racketeering activity.

166.    Walgreens agreed and conspired to commit at least two of the predicate acts of mail and wire fraud in furthering the common purpose of the enterprise to commit multiple and ongoing frauds against Plaintiff and members of the Class by misrepresenting dosage forms of ranitidine and fluoxetine prescriptions.

167.    This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

168.    As a direct and proximate result of the racketeering activities of the resulting violations of 18 U.S.C. § 1962(c), Plaintiff and the Class have been injured in their business and property.

WHEREFORE, Plaintiff requests judgment in its and the Class's favor, and against Walgreens, and for the following relief:

(a) Compensatory damages in the amount to be determined at trial;

(b) Treble the amount of compensatory damages;

(c) Prejudgment interest along with the costs of bringing suit, including reasonable attorneys' fees; and

(d) Such other and further relief as the Court deems just and equitable.

## COUNT IV

**VIOLATION OF 18 U.S.C. § 1962(d)**
**Racketeer Influenced and Corrupt Organizations Act**
**(Against Par)**

169.     Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

170.     This action is brought under 18 U.S.C. § 1964(c) for violation of 18 U.S.C. § 1962(d).

171.     As set forth herein, Par agreed and conspired with various persons, including Walgreens, to violate 18 U.S.C. § 1962(c) by directly and indirectly conducting and participating in the conduct of the affairs of the Walgreens/Par/Hrp Enterprise through a pattern of racketeering activity.

172.     Par agreed and conspired to commit at least two of the predicate acts of mail and wire fraud in furthering the common purpose of the enterprise to commit multiple and ongoing

68

frauds against Plaintiff and members of the Class by misrepresenting dosage forms of ranitidine and fluoxetine prescriptions.

173.    This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

174.    As a direct and proximate result of the racketeering activities of the resulting violations of 18 U.S.C. § 1962(c), Plaintiff and the Class have been injured in their business and property.

WHEREFORE, Plaintiff requests judgment in its and the Class's favor, and against Par, and for the following relief:

(a) Compensatory damages in the amount to be determined at trial;

(b) Treble the amount of compensatory damages;

(c) Prejudgment interest along with the costs of bringing suit, including reasonable attorneys' fees; and

(d) Such other and further relief as the Court deems just and equitable.

**JURY TRIAL DEMANDED**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands trial by jury.

Dated: January 11, 2012

Respectfully submitted,

UNITED FOOD AND COMMERCIAL
WORKERS UNIONS AND EMPLOYERS
MIDWEST HEALTH BENEFITS FUND,
individually and on behalf of others
similarly situated,

By: /s/Patrick E. Cafferty
One of its attorneys

Patrick E. Cafferty
Anthony F. Fata
CAFFERTY FAUCHER LLP
30 North LaSalle Street, Suite 3200
Chicago, IL 60602
Tel: (312) 782-4880
Fax: (312) 782-4485
pcafferty@caffertyfaucher.com
afata@caffertyfaucher.com

Jonathan D. Karmel
THE KARMEL LAW FIRM
221 N. LaSalle Street, Suite 1414
Chicago, IL 60601
Tel: (312) 641-2910
Fax: (312) 641-0781
jon@karmellawfirm.com

Kenneth A. Wexler
Dawn M. Goulet
WEXLER WALLACE LLP
55 West Monroe, Suite 3300
Chicago, IL 60603
Tel: (312) 346-2222
Fax: (312) 346-0022
kaw@wexlerwallace.com
dmg@wexlerwallace.com

70

**TABLE OF EXHIBITS**

| Exhibit # | Description | Bates No. | Lisitza Ex.[4] |
|---|---|---|---|
| 1 | Letter from Janet Woodcock, M.D., FDA Center for Drug Evaluation and Research, December 1, 2000 | | 4 |
| 2 | Walgreens Ranitidine Analysis (tablets vs. gelcaps) | PAR-TX 0000163 | 5 |
| 3 | Excerpts from Testimony of Julie Trendowicz, June 19, 2008 | | 6 |
| 4 | Bill Groth email 05/15/2001 | W 11022 | 7 |
| 5 | Sworn Statement of William Groth, November 15, 2006 | | 8 |
| 6 | Tom Lawlor email, July 12, 2001 | W 04526 | 9 |
| 7 | Walgreens/Par/Hrp | W 00066-70 | 11 |
| 8 | July 25, 2001 letter from Ill. Dept. of Public Health to Thomas Lawlor | W 00191-92 | 12 |
| 9 | Bill Groth email chain starting 07/24/2003 | W 05213-21 | 13 |
| 10 | Tom Lawlor email chain November 17, 2004 | W 09542-43 | 14 |
| 11 | Frank DeStefano email chain 10/12/2004 | W 05260-61, W 11048 | 15 |
| 12 | Fluoxetine marketing materials | PAR-TX 0006383 | 21 (last page) |
| 13 | FUL Changes to Transmittal No. 37 | | 23 |
| 14 | Nick DiMaio email 10/16/2001 | PAR-VA 0109889 | 24 |
| 15 | State Board of Pharmacy Generic Substitution Policies.  Presented by Cieplak Research Inc. April 17, 2001 | PAR-TX 0001470-91 | 28 |
| 16 | Pam Cieplak email 02/18/2001 | PAR-VA 0923837 | 29 |
| 17 | State Board of Pharmacy Generic Substitution Policies (draft) | PAR-VA 0923838-43 | 30 |
| 18 | Par Caremark Presentation 6/11/01 | PAR-TX 0006054-69 | 32 |
| 19 | FDA's August 2, 2001 approval letter to Par | | 33 |
| 20 | July 24, 2001 letter agreement from Par to John Ziebell | W07270 | 35 |
| 21 | Tom Lawlor email 08/03/2001 George Riedl email 09/21/2001 | W 06884, W 04618-19 | 37 |

---

[4] *United States of America ex rel. Bernard Lisitza v. Par Pharmaceutical Companies, Inc., et al.,* No. 06-c-6131 (N.D. Ill.).  [Doc. No. 35]

| 22 | Scott Tarriff letter to George Riedl, August 23, 2001 | W 00109 | 38 |
| 23 | Greg Primuth email 04/22/2002 | W 04452-53 | 39 |
| 24 | Alphapharma email chain | A 025902 | 17 |
| 25 | Scott Tarriff testimony Oct. 23, 2008 | | 27 |
| 26 | Summaries of UFCW transactional data | | |