IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED FOOD AND COMMERCIAL WORKERS UNIONS AND EMPLOYERS MIDWEST HEALTH BENEFITS FUND, | ) ) ) ) ) | |
| Plaintiff, | ) ) | No. 12 C 204 |
| v. | ) ) | |
| WALGREEN COMPANY, et. al., | ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

SAMUEL DER-YEGHIAYAN, District Judge

This matter is before the court on Defendant Walgreen Company's (Walgreens) motion to dismiss, and Defendant PAR Pharmaceutical Companies, Inc.'s and Defendant PAR Pharmaceutical, Inc.'s (collectively referred to as "PAR") motion to dismiss. For the reasons stated below, the motions to dismiss are granted.

**BACKGROUND**

Plaintiff United Food and Commercial Workers Unions and Employers Midwest Health Benefits Fund (Fund) allegedly provides health care benefits to approximately 15,000 participants and their family members (Fund Participants). The Fund, as a third-party payor (TPP), allegedly contracted with a pharmacy benefit

1

manager (Manager) to establish, on behalf of the Fund, the rate at which the Fund would reimburse Walgreens for various prescriptions filled by Walgreens, including prescriptions for ranitidine and fluoxetine, which are the generic equivalents of Zantac and Prozac, respectively. PAR allegedly manufactures, markets, and sells the drugs ranitidine and fluoxetine. From July 1, 2001 to December 31, 2004 (Relevant Time Period), Walgreens allegedly purchased ranitidine capsules and fluoxetine tablets from PAR, and resold them to many Fund Participants. The Fund, through its Manager, allegedly paid Walgreens for the cost of the ranitidine capsules and fluoxetine tablets, minus any co-pays paid by Fund Participants.

According to the Fund, the price of many generic drugs is based upon, and controlled by, a Maximum Allowable Cost (MAC), which is set by the TPP or Manager, based upon the marketplace for any given generic drug. The MAC represents the maximum amount a TPP will pay a pharmacy for a particular generic drug, regardless of the manufacturer. When there is no MAC, a TPP instead agrees to pay the pharmacy the average wholesale price (AWP) of a drug. The AWP of any given drug is allegedly unrelated to pricing in the marketplace and higher than the MAC. Thus, a pharmacy allegedly makes a higher profit when it sells a generic drug not subject to MAC pricing restrictions.

Ranitidine is allegedly manufactured most often in tablet form, and ranitidine tablets are allegedly subject to MAC pricing restrictions. Fluoxetine is allegedly manufactured most often in capsule form, and fluoxetine capsules are also allegedly subject to MAC pricing restrictions. PAR allegedly manufactures ranitidine in

capsule form and fluoxetine in tablet form. The ranitidine capsules and fluoxetine tablets manufactured by PAR are allegedly not subject to MAC pricing restrictions, and are instead allegedly priced based upon the AWP.

The Fund alleges that during the Relevant Time Period, Walgreens illegally filled prescriptions for ranitidine tablets and fluoxetine capsules using higher-priced ranitidine capsules and fluoxetine tablets, thus overcharging the Fund for such drugs. Walgreens' decision to fill prescriptions with higher-priced ranitidine capsules and fluoxetine tablets was allegedly made after meetings and discussions with PAR executives, who allegedly presented marketing materials to Walgreens showing the increased profits Walgreens could realize if Walgreens switched to filling prescriptions with ranitidine capsules and fluoxetine tablets manufactured by PAR. PAR also allegedly falsely marketed their ranitidine capsules and fluoxetine tablets as AB rated generic equivalents of the drugs regularly prescribed.

The Fund alleges that in July of 2001, Walgreens began automatically filling all generic ranitidine prescriptions with PAR manufactured ranitidine capsules. The Fund also alleges that in August of 2001, Walgreens began automatically filling all generic fluoxetine prescriptions with PAR manufactured fluoxetine tablets. In late July 2001, the Illinois Department of Public Health allegedly warned Walgreens that ranitidine capsules were not AB rated generic equivalents. Walgreens allegedly continued to substitute ranitidine capsules for ranitidine tablets until 2004, when Walgreens allegedly learned that it was allegedly under federal and state investigations as a result of this practice. After discontinuing the ranitidine and

fluoxetine substitution programs, Walgreens allegedly received price reductions on various drugs, including ranitidine, from PAR, so that Walgreens could recover future lost profits. The Fund alleges that during the relevant time period, Walgreens and PAR participated in a conspiracy to evade price limits set on generic drugs and increase their profits at the expense of the Fund and other TPPs. The Fund includes in its complaint a claim brought against Walgreens alleging a violation of Section 1962(c) of the Racketeering Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 *et seq.* (Section 1962(c)) (Count I), a claim against PAR alleging a violation of Section 1962(c) (Count II), a claim against Walgreens alleging a violation of § 1962(d) of RICO (Section 1962(d)) (Count III), and a claim against PAR alleging a violation of Section 1962(d) (Count IV). Walgreens and PAR have each moved to dismiss the claims brought against them.

## LEGAL STANDARD

In ruling on a motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6) (Rule 12(b)(6)), a court must "accept as true all of the allegations contained in a complaint" and make reasonable inferences in favor of the plaintiff. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Thompson v. Ill. Dep't of Prof'l Regulation*, 300 F.3d 750, 753 (7th Cir. 2002). To defeat a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009)(internal quotations omitted)(quoting in part *Twombly*, 550

U.S. at 570). A complaint that contains factual allegations that are "merely consistent with a defendant's liability . . . stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 129 S.Ct. at 1949 (internal quotations omitted).

## DISCUSSION

Defendants argue that the RICO claims brought against them must be dismissed (1) because the Fund's claims are based upon regulatory violations, (2) because the Fund had not adequately pled the elements of a Section 1962(c) claim, (3) because a claim for violation of Section 1962(d) cannot be sustained absent a valid Section 1962(c) claim, and (4) because any RICO claims are barred by the statute of limitations.

### A. Regulatory Violation as the Basis for RICO Claims

Defendants argue that the alleged acts of substituting dosage forms when filling ranitidine and fluoxetine prescriptions constitute regulatory violations that cannot be used to support a RICO claim. Generally, federal courts have held that RICO claims cannot be predicated upon violations of state or federal laws that do not create a private cause of action and exclusively provide administrative remedies. *See Brown v. Cassens Transport Co.*, 675 F.3d 946, 955 (6th Cir. 2012)(observing that "[c]ourts have held RICO inapplicable to claims that should have been raised before *federal* agencies that had exclusive-remedy clauses in their enabling

5

statutes")(emphasis in original)(citing *McCulloch v. PNC Bank Inc.,* 298 F.3d 1217, 1226-27 (11th Cir. 2002)(addressing Higher Education Act); *Ayres v. Gen. Motors Corp.,* 234 F.3d 514, 521-22 (11th Cir. 2000)(addressing National Traffic and Motor Vehicle Safety Act); *Bodimetric Health Servs., Inc. v. Aetna Life & Cas.*, 903 F.2d 480, 486-87 (7th Cir. 1990) (addressing Social Security Act)); *see also Danielsen v. Burnside-Ott Aviation Training Ctr., Inc.*, 941 F2d 1220, 1229 (D.C. Cir. 1991) (stating that "the statutory scheme for administrative relief set forth by Congress in the [Service Contract Act] leaves no room for a RICO action"); *Norman v. Niagara Mohawk Power Corp.*, 873 F.2d 634, 637-38 (2d Cir. 1989)(stating that "[a]rtful invocation of controversial civil RICO, particularly when inadequately pleaded, cannot conceal the reality that the gravamen of the complaint" is a violation of the Energy Reorganization Act).

     The Fund has alleged that the substitution of dosage forms was done "in violation of federal and state law and regulations." (Compl. Par. 47). In addition, the Fund specifically cites to the Illinois Pharmacy Practice Act, 225 ILCS 85/25, which provides that a pharmacist can sometime substitute a prescribed drug with another drug, as long as "the selected drug has a unit price less than the drug product specified in the prescription." (Compl. Par. 18). The Fund also alleges that under many state laws, pharmacists are required to notify prescribers if they dispense a different dosage form than the form prescribed. (Compl. Par. 74-75). In addition, the Fund attaches to its complaint a letter issued by the United States Department of Health and Human Services indicating that, under the Federal Food, Drug and

Cosmetic Act (FDCA) and its corresponding regulations, bioequivalent tablets and capsules are *not* recognized as the same dosage form, or in other words, as pharmaceutical equivalents. (Compl. Ex. 1). The Fund also attaches to its complaint a letter from the Illinois Department of Public Health indicating that Defendants' substitution programs violated 410 ILCS 62/3.14 of the Illinois Food, Drug and Cosmetic Act (ILFDCA), 410 ILCS 62/1 *et seq.*, as well as spreadsheets summarizing similar state laws. (Compl. Ex. 8, 15, 17). As Defendants correctly point out, the FDCA, the ILFDCA, and similar state statutes do not create a private right of action. *See, e.g., Readel ex rel. Estate of Lorke v. Vital Signs, Inc.*, 2002 WL 31177529, at *3 (N.D. Ill. 2002) (stating that "the FDCA is explicit that only the Federal Government, and not private litigants, may bring enforcement actions under that statute")(citing *Buckman Co. v. Plaintiffs' Legal Comm.,* 531 U.S. 341, 349 (2001)); *Suarez v. Pierard*, 663 N.E.2d 1039, 1043 (Ill. App. Ct. 1996)(stating that "the [Illinois] Pharmacy Act does not create a cause of action for damages for violation of the Act"). Thus, the Fund's RICO claims are predicated upon violations of state and federal laws that do not create a private right of action.

The Fund argues that it has merely cited state and federal law as background and context for its RICO claims. The Fund cites *Fujisawa Pharm. Co v. Kapoor*, 115 F.3d 1332 (7th Cir. 1997), for the proposition that federal courts regularly accept jurisdiction over cases that invoke the FDCA and its corresponding regulations. However, *Fujisawa* involved a RICO claim brought under the securities laws prior to the time that Congress "deleted securities frauds from the list of 'racketeering'

7

activities that trigger the application of RICO." *Id.* at 1337-38. Thus, *Fujisawa* is inapposite. The Fund also cites to several other cases in which courts have held that references to the FDCA in a complaint do not necessarily defeat false advertising or marketing claims, including claims brought under the Lanham Act, 15 U.S.C. § 1051 *et seq*. However, in the cases cited by the Fund, the false advertising or marketing claims could be proven without regard to the regulations. *See, e.g., Grove Fresh Distributors, Inc. v. Flavor Fresh Foods, Inc*., 720 F.Supp. 714, 716 (N.D. Ill. 1989)(indicating that a plaintiff could use the FDCA "to establish the standard or duty which defendants allegedly failed to meet," but that a claim based solely on a violation of the FDCA or its accompanying regulations would be insufficient to sustain a false marketing claim). In the instant action, if there is no violation of the laws referenced in the complaint, the Fund cannot sustain its RICO claims against Defendants. Further, the regulations promulgated in connection with the FDCA that are cited in this case are necessary to determine whether the FDCA and various state laws have been violated, since a layperson would not know whether different dosage forms are pharmaceutical equivalents. Since the Fund's complaint relies on regulatory violations to support its RICO claims, the Fund has failed to state a claim upon which relief can be granted.

### B. Elements of Section 1962(c) RICO Claim

Defendants argue that even if the Fund's RICO claims do not rely on regulatory violations, the Fund has not sufficiently alleged the elements of a Section

1962(c) RICO Claim. Pursuant to Section 1962(c), it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). To state a valid RICO claim under Section 1962(c), a plaintiff must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Slaney v. The Intern. Amateur Athletic Federation*, 244 F.3d 580, 597 (7th Cir. 2001)(citation omitted). Each element of a RICO claim must be clearly satisfied because RICO "does not cover all instances of wrongdoing[;] [r]ather, it is a unique cause of action that is concerned with eradicating organized, long-term, habitual criminal activity." *Gamboa v. Velez*, 457 F.3d 703, 705 (7th Cir. 2006).

    1. Conduct of an Enterprise

Defendants argue that the Fund's Section 1962(c) claims fail because the allegations in the complaint suggest that Walgreens and PAR were merely conducting their own affairs, as opposed to the affairs of an enterprise. The Fund argues that it has adequately pled the existence of an association-in-fact enterprise. To adequately plead an association-in-fact enterprise, a plaintiff must allege facts to plausibly suggest "at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938,

9

946 (2009). In addition, a plaintiff must allege facts that plausibly suggest an enterprise "meaningfully distinct from the entities that comprise it such that the entity sought to be held liable [under RICO] can be said to have controlled and conducted the enterprise rather than merely its own affairs." *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 399 (7th Cir. 2009)(citations omitted); *see also Jay E. Hayden Foundation v. First Neighbor Bank, N.A.*, 610 F.3d 382, 389 (7th Cir. 2010)(stating that "the RICO offense is *using* an enterprise to engage in a pattern of racketeering activity," and affirming that "liability depends on showing that the defendants conducted or participated in the conduct of the *enterprise's* affairs, not just their *own* affairs")(citations omitted)(internal quotations omitted)(emphasis in original). Moreover, a plaintiff must allege the existence of "an organization with a structure and goals separate from the predicate acts themselves." *Crichton*, 576 F.3d at 400.

In the instant action, the Fund has alleged that, as part of its marketing strategy, PAR made misrepresentations to pharmacies like Walgreens regarding the propriety of switching dosage forms. (Compl. Par. 77). The Fund also alleges that PAR provided financial incentives to pharmacies like Walgreens as part of its marketing strategy. (Compl. Par. 79). In addition, the Fund alleges that Walgreens indicated to its pharmacists that, where the law required it, they needed to obtain permission to switch dosage forms. (Compl. Ex. 21). Such facts show that Defendants were each conducting their own affairs, rather than the affairs of an enterprise. In addition, the alleged predicate acts involve fraudulent billing for drugs that were more expensive than those prescribed. Thus, in the instant action, the Fund

has not identified an organization with goals separate from the predicate acts themselves. Based on the above, the Fund has not sufficiently alleged the existence of an enterprise.

### 2. Pattern of Racketeering Activity

Defendants also argue that the Section 1962(c) claims fail because the Fund has failed to allege facts to suggest a pattern of racketeering activity. Under RICO, "racketeering activity" includes "any act which is indictable under [18 U.S.C.] section 1341 (relating to mail fraud), [and 18 U.S.C.] section 1343 (relating to wire fraud). . . ." 18 U.S.C. § 1961(1)(B). A pattern of racketeering activity is sufficiently established if, "in addition to at least two predicate acts, a RICO plaintiff shows 'that the racketeering predicates are related, and that they amount to or pose a threat of *continued* criminal activity.'" *Williams v. Aztar Indiana Gaming Corp.*, 351 F.3d 294, 298 (7th Cir. 2003)(emphasis in orginal)(citations omitted). Where a closed-ended period of racketeering activity is alleged, such as in the instant case, a "RICO plaintiff can satisfy the continuity prong . . . by [ ] demonstrating . . . conduct that existed for such an extended period of time that a threat of future harm is implicit." *Roger Whitmore's Auto. Services, Inc. v. Lake County, Illinois*, 424 F.3d 659, 673 (7th Cir. 2005). Courts assessing continuity generally consider "(1) the number and variety of predicate acts and the length of time over which they were committed, (2) the number of victims, (3) the presence of separate schemes, and (4) the occurrence of distinct injuries. *Id.* (citing *Morgan v. Bank of Waukegan,* 804

F.2d 970, 975 (7th Cir. 1986)). However, the Seventh Circuit has instructed that such factors should be considered "with an eye toward achieving a natural and commonsense result, recognizing that Congress was concerned in RICO with long-term criminal conduct." *Gamboa v. Velez*, 457 F.3d 703, 709 (7th Cir. 2006)(citations omitted)(internal quotations omitted). In the instant action, the Fund has alleged that Defendants engaged in two similar schemes, involving similar predicate acts, undertaken over a concurrent period of approximately three years. Such allegations do not sufficiently establish closed-ended continuity. *See Roger Whitmore's Auto Services*, 424 F.3d at 673 (stating that "[p]erhaps the most important element of RICO continuity is its temporal aspect," and indicating that "closed periods of several months to several years did not qualify as 'substantial' enough to satisfy continuity"); *see also Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016, 1024-25 (7th Cir. 1992)(indicating that "mail and wire fraud allegations are unique among predicate acts because multiplicity of such acts may be no indication of the requisite continuity of the underlying fraudulent activity")(citations omitted)(internal quotations omitted). Therefore, in addition to failing to sufficiently plead the existence of an enterprise, the Fund has also failed to sufficiently plead a pattern of racketeering activity. Based on the above, the Fund has failed to state a valid claim under Section 1962(c).

    C.  Claims Brought Pursuant to Section 1962(d)

Defendants argue that the Fund's failure to state a claim under Section 1962(c)

necessarily results in the failure to state a claim under Section 1962(d). Pursuant to Section 1962(d), it is "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." Therefore, to state a valid claim under Section 1962(d), "a plaintiff must allege that (1) the defendant agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering activity, and (2) the defendant further agreed that someone would commit at least two predicate acts to accomplish those goals." *DeGuelle v. Camilli*, 664 F.3d 192, 204 (7th Cir. 2011)(citation omitted). As discussed above, the Fund has not sufficiently alleged the existence of an enterprise. Therefore, the Fund has failed to state a valid claim under Section 1962(d).

### D. Statute of Limitations

Defendants also argue that the Fund's claims are barred by the statute of limitations. The statute of limitations for a civil RICO claim is four years, and it begins to run "when the plaintiffs discover, or should, if diligent, have discovered, that they had been injured by the defendants." *Cancer Foundation, Inc. v. Cerberus Capital Management, LP*, 559 F.3d 671, 674 (7th Cir. 2009)(citation omitted). In a RICO case, "a plaintiff does not need to know that his injury is actionable to trigger the statute of limitations-the focus is on the discovery of the harm itself, not the discovery of the elements that make up a claim." *Id.* The Fund alleges that, even exercising reasonable diligence, it could not discover its claims until June of 2008, "when the United States Department of Justice announced Walgreens' agreement to

reimburse governmental entities for Medicaid claims." (Compl. Par. 106). However, other allegations in the complaint reveal that the Fund's prescription records from as early as July of 2001 indicated that Walgreens was likely switching dosage forms when filling certain prescriptions of Fund Participants. (Compl. Par. 91-103). The complaint in this case was not filed until early 2012, more than ten years after such prescription records were available to the Fund for review. Therefore, in addition to having failed to state a valid claim under RICO, the Fund's RICO claims would also be untimely.

## CONCLUSION

Based on the foregoing analysis, the motions to dismiss are granted.

_____
Samuel Der-Yeghiayan
United States District Court Judge

Dated: July 26, 2012